EMILY P. RICH, Bar No. 168735
CONCEPCIÓN E. LOZANO-BATISTA, Bar No. 227227
WEINBERG, ROGER & ROSENFELD, P.C.
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
Telephone (510) 337-1001
Fax (510) 337-1023
E-Mail:  erich@unioncounsel.net
       clozano@unioncounsel.net

JULIA PENNY CLARK (*admitted pro hac vice*)
ROBERT ALEXANDER (*admitted pro hac vice*)
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth St. N.W. Tenth Floor
Washington, DC 20005
Telephone (202) 842-2600
Fax (202) 842-1888
E-Mail: jpclark@bredhoff.com
    ralexander@bredhoff.com

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN M. REYES, SALVATORE TAGLIARENI, ANGEL DE LA CRUZ, ANTONIO MEROLLA, SMAIL MUSOVIC, TESFAYE GHEBREMEDHIN, PHILIP ROGERS, ALMOND REID, CARMELO CALABRO, RUSSELL NEUBERT, and JOHN WILLIAMS, individually and as representatives on behalf of a class of similarly situated persons,<br><br>                   Plaintiffs,<br><br>     v.<br><br>BAKERY AND CONFECTIONERY UNION AND INDUSTRY INTERNATIONAL PENSION FUND; and STEVEN BERTELLI, DAVID B. DURKEE, JETHRO A. HEAD, ART MONTMINY, ROBERT OAKLEY, JAMES RIVERS, RANDY D. ROARK, BARBARA BRASIER, TRAVIS CLEMENS, JON MCPHERSON, LOU MINELLA, DOUG RUYGROK, and JOHN WAGNER, in their official capacities as Trustees,<br><br>                 Defendants. | Case No. 3:14-cv-5596 (JST)<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>The Honorable Jon S. Tigar<br><br>Hearing Date:   October 22, 2015<br>Hearing Time:  2:00 p.m.<br>Courtroom      9 (19th Floor) |

**NOTICE OF MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on October 22, 2015 at 2:00 p.m., or as soon thereafter as this matter may be heard, in the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, 19th Floor, before the Honorable Jon S. Tigar, Defendants will and hereby do make this Motion for Judgment on the Pleadings under Fed. R. Civ. P. 12(c).

Defendants respectfully request that the Court grant their motion and enter judgment in their favor on all four counts in the amended complaint. This motion is based on this Notice of Motion, the accompanying Memorandum of Law, the Declaration of John Beck,[*] and any documents filed in reply, the papers and pleadings on file in this action, and such other oral and/or documentary evidence or argument as may be presented at the time of the hearing on this matter.

Dated: September 24, 2015

BREDHOFF & KAISER, P.L.L.C.
WEINBERG, ROGER & ROSENFELD, P.C.


By:     /s/ Robert Alexander
        ROBERT ALEXANDER (*admitted pro hac vice*)
        JULIA PENNY CLARK (*admitted pro hac vice*)
        CONCEPCIÓN E. LOZANO-BATISTA
        EMILY P. RICH

        Attorneys for Defendants

---

[*] In the course of reviewing documents in connection with this litigation, we discovered two errors in Mr. Beck's prior declaration, filed with the Court in connection with Defendants' transfer motion, and repeated in the motion itself.  First, we stated that "the Rehabilitation Plan was designed by a special committee of Trustees that met entirely in Maryland." Mot. to Transfer [dkt. # 20] at 15-16; *see also* Beck Decl. in Supp. of Transfer [dkt. # 21] ¶ 27. Second, John Beck's declaration regarding the transfer motion stated that the "full Board of Trustees met in Kensington, Maryland . . . on November 7, 2012." *Id.* ¶ 29. While the vast majority of the special committee meetings were in Kensington, Maryland, one meeting was held in Boston in conjunction with the full Board's biannual meeting. Beck Decl. in Supp. of Judgment on the Pleadings ¶ 4. And some of the Trustees participated in the November 7, 2012 Board meeting telephonically.  *Id.* ¶ 4.  Mr. Beck's instant declaration notes and corrects the prior inadvertent errors.

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... ii

BACKGROUND ........................................................................................................................2

   A.   The History, Nature, and Purpose of the PPA ...................................................2

   B.   Factual Allegations ...........................................................................................4

ARGUMENT ..............................................................................................................................7

   A.   Defendants Are Entitled to Judgment on Count I ..............................................8

   B.   Defendants Are Entitled to Judgment on Count II............................................13

      1. Count II contains only legal conclusions and allegations contrary to the document on which the claim relies. ...............................................................14

      2. The premise of Count II's claim against the Defendants is contrary to the PPA ...............16

   C.   Defendants are Entitled to Judgment on Count III .............................................21

   D.   Defendants are Entitled to Judgment on Count IV .............................................22

CONCLUSION...........................................................................................................................25

## <u>TABLE OF AUTHORITES</u>

### CASES

*Alcantara v. Bakery & Confectionery Union & Indus. Int'l Pension Fund Plan*,
  751 F.3d 71 (2d Cir. 2014)......................................................................................4, 6

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*,
  No. CV-14-02139, 2015 WL 1608991 (C.D. Cal. Apr. 10, 2015) ...........................23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .....................................................................7, 14

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)....................................................................................................11

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................7

*Cal. ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. United States*,
  215 F.3d 1005 (9th Cir. 2000) ...................................................................................24

*Clegg v. Cult Awareness Network*, 18 F.3d 752 (9th Cir. 1994) ...................................14

*Cousins v. Lockyer*, 568 F.3d 1063 (9th Cir. 2009)........................................................7

*Diaz v. United Agr. Emp. Welfare Benefit Plan & Trust*,
  50 F.3d 1478 (9th Cir. 1995) .....................................................................................24

*Elser v. IAM Nat'l Pension Fund*, 684 F.2d 648 (9th Cir. 1982)..................................25

*Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112 (9th Cir. 2014)........4, 7, 16, 22

*Graphic Commc'ns Union, Dist. Council No. 2 v. GCIU-Employer Ret. Ben. Plan*,
  917 F.2d 1184 (9th Cir. 1990) ...................................................................................23

*Harm v. Bay Area Pipe Trades Pension Plan Trust Fund*,
  701 F.2d 1301 (9th Cir. 1983) ...................................................................................25

*In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) ...........................11, 21

*In re Hostess Brands, Inc.*, 499 B.R. 406 (S.D.N.Y. 2013)............................................6

*Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*,
  407 F.3d 1027 (9th Cir. 2005) ...................................................................................11

*Johnson v. CMC Prop. Leasing, Inc.*, No. 12-1309-SAC, 2012 WL 6025601
  (D. Kan. Dec. 4, 2012) ..............................................................................................15

*Keum v. Virgin America, Inc.*, 781 F. Supp. 2d 944 (N.D. Cal. 2011) ...........................7

*King v. Bd. of Trs. of Cal. State Univ.*, No. 14-5020, 2015 WL 1519268
  (N.D. Cal. Apr. 2, 2015) ............................................................................................11

*King v. Burwell*, 135 S. Ct. 2480 (2015)................................................................................17

*Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638 (9th Cir. 2014).....................................11

*Lockheed Corp. v. Spink*, 517 U.S. 882 (1996)..............................................................22, 23

*McGuigan v. Local 295/Local 851 IBT Emp'r Grp. Pension Plan*,
   No. 11-CV-2004 JG MDG, 2011 WL 3421318 (E.D.N.Y. Aug. 4, 2011)...........................1, 17

*Moss v. U.S. Secret Serv.*, 572 F.3d 962 (9th Cir. 2009) ...........................................15, 21

*Pappas v. Buck Consultants, Inc.*, 923 F.2d 531 (7th Cir. 1991) ....................................22

*Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *superseded by statute on
   other grounds as recognized in Abrego v. The Dow Chemical Co.*,
   443 F.3d 676 (9th Cir. 2006) .......................................................................................5, 9

*Peel v. Brooksamerica Mortgage Corp.*, 788 F. Supp. 2d 1149 (C.D. Cal. 2011) ...............8, 9, 12

*Souza v. Trs. of W. Conference of Teamsters*, 663 F.2d 942 (9th Cir. 1981) .................20

*Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir 2001) ...................................16

*Trs. of Local 138 Pension Trust Fund v. F.W. Honerkamp Co, Inc.*,
   692 F.3d 127 (2d Cir. 2012).......................................................................................2, 17

*United States v. Corinthian Colls.*, 655 F.3d 984 (9th Cir. 2011) ...................................5

*United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003)..............................................5, 7

*Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090 (9th Cir. 2004) .........................22

## STATUTES AND RULES

29 U.S.C. § 1002(16)(B)(iii)..............................................................................................22

29 U.S.C. § 1054(g) .............................................................................................................3

29 U.S.C. § 1084(c)(2)(A) ............................................................................................13, 14

29 U.S.C. § 1084(c)(3)..........................................................................................................13

29 U.S.C. § 1084(c)(3)(A) ....................................................................................................14

29 U.S.C. § 1085(a)(2).................................................................................................3, 4, 19

29 U.S.C. § 1085(b) .......................................................................................3, 13, 17, 18, 22

29 U.S.C. § 1085(b)(1) .........................................................................................................18

29 U.S.C. § 1085(b)(2) ..............................................................................................14, 18, 19, 21

29 U.S.C. § 1085(b)(2)(C) ..............................................................................................6, 15

29 U.S.C. § 1085(b)(2)(C)(ii) ...................................................................................................25

29 U.S.C. § 1085(b)(3) ...................................................................................................1, 3, 18

29 U.S.C. § 1085(b)(3)(A) .....................................................................................4, 18, 19, 21

29 U.S.C. § 1085(b)(3)(B)(i) ..........................................................................................17, 18

29 U.S.C. § 1085(b)(3)(B)(ii) ...............................................................................................18

29 U.S.C. § 1085(b)(3)(B)(iii) ..................................................................................3, 18, 22

29 U.S.C. § 1085(b)(3)(C) ....................................................................................................18

29 U.S.C. § 1085(b)(3)(D) .........................................................................4, 6, 18, 19, 20

29 U.S.C. § 1085(b)(3)(D)(i) ..........................................................................................8, 19

29 U.S.C. § 1085(c) ..............................................................................................................18

29 U.S.C. § 1085(c)(1) ..........................................................................................................20

29 U.S.C. § 1085(d) ..............................................................................................................18

29 U.S.C. § 1085(e) ......................................................................................1, 13, 17, 18, 21

29 U.S.C. § 1085(e)(1) ....................................................................................8, 18, 19, 20

29 U.S.C. § 1085(e)(1)(A) ....................................................................................................19

29 U.S.C. § 1085(e)(1)(B) ....................................................................................................19

29 U.S.C. § 1085(e)(1)(B)(i) ..................................................................................................4

29 U.S.C. § 1085(e)(3)(B) ....................................................................................................19

29 U.S.C. § 1085(e)(7) ..........................................................................................................25

29 U.S.C. § 1085(e)(8) ............................................................................................................4

29 U.S.C. § 1085(e)(8)(A)(i) ..................................................................................................7

29 U.S.C. § 1085(e)(8)(A)(ii) .................................................................................................8

29 U.S.C. § 1085(e)(8)(A)(iii) ..........................................................................................4, 24

29 U.S.C. § 1085(e)(8)(C) ....................................................................................................18

29 U.S.C. § 1085(e)(8)(C)(i) .............................................................................................7, 9

29 U.S.C. § 1085(e)(8)(C)(i)(I) ..............................................................................................9

29 U.S.C. § 1085(e)(8)(C)(i)(II) .............................................................................................9

29 U.S.C. § 1085(e)(8)(C)(i)(III) ...........................................................................9

29 U.S.C. § 1085(e)(8)(C)(ii) ...............................................................................12

29 U.S.C. § 1085(e)(8)(C)(iii)(II) .........................................................................12

29 U.S.C. § 1085(f)...........................................................................................18, 21

29 U.S.C. § 1104 ....................................................................................................22

29 U.S.C. § 1104(a) ...............................................................................................25

29 U.S.C. § 1132(a)(3)...........................................................................................20

29 U.S.C. § 1132(a)(10).....................................................................................19, 20

29 U.S.C. § 1132(c)(2)...........................................................................................18

Fed. R. Civ. P. 8 .....................................................................................................14

Fed. R. Civ. P. 12(b)(6)............................................................................................7

Fed. R. Civ. P. 12(c) ................................................................................................7

## OTHER AUTHORITIES

Alicia Munnell & Jean-Pierre Aubry, *Can PBGC Save Multiemployer Plans?*,
    No. 14-16 (Sept. 2014).......................................................................................2

Dept. of Labor, Dept. of Treasury & PBGC, *Multiemployer Pension Plans: Report to
    Congress Required by the Pension Protection Act of 2006* (Jan. 2013) *available at*
    http://www.pbgc.gov/documents/pbgc-report-multiemployer-pension-plans.pdf........2, 3, 4, 25

U.S. Gov't Accountability Office*, Timely Action Needed to Address Impending
    Multiemployer Plan Insolvencies*, GAO-13-240 (Mar. 28, 2013), *available at*
    http://www.gao.gov/assets/660/653383.pdf.....................................................2, 4, 25

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

The Pension Protection Act of 2006 ("PPA") requires that a multiemployer pension plan's actuary evaluate and certify the plan's financial health each year. *See* ERISA § 305(b)(3), 29 U.S.C. § 1085(b)(3).  In March 2012, the Bakery & Confectionery Union and Industry International Pension Fund (the "Fund"), the pension plan at issue in this case, was certified to be in "critical status."  *See* Dkt. No.1-5 (Fund 2012 Rehabilitation Plan ("Rehabilitation Plan")) at 1. Once a plan's actuary certifies the Fund to be in critical status, the PPA mandates that the plan and the plan sponsors (here, the Fund's trustees) take immediate steps to attempt to remedy the financial status, including adoption of a "rehabilitation plan," comprising a series of financial changes to the Fund's benefit and contribution structure, together geared to right the plan's financial ship and protect the core pension interests of all the plan's participants.  *See generally* 29 U.S.C. § 1085(e); *McGuigan v. Local 295/Local 851 IBT Emp'r Grp. Pension Plan*, No. 11-CV-2004 JG MDG, 2011 WL 3421318, at *8 (E.D.N.Y. Aug. 4, 2011) ("the chief purpose of the PPA was to require the trustees of pension plans in critical status to take steps to reduce payouts of adjustable benefits in order to rehabilitate the plans financially").

Consistent with its obligations under the PPA, the Fund crafted and adopted a Rehabilitation Plan in November 2012.  Dkt. No. 1-5; Plaintiffs' First Amended Class Action Complaint ("FAC") ¶ 43.  Among the many benefit reductions and contribution increases the Rehabilitation Plan included to address the Fund's long term solvency prospects, it amended two special supplemental early retirement pension benefits—known as the "Golden 80" and "Golden 90" pensions—that had previously provided participants a full unreduced pension prior to their normal retirement age of 65, even if they were no longer working for a contributing employer (referred to as "covered employment").  Pursuant to the Rehabilitation Plan amendment, after April 30, 2012 Fund participants could not qualify to receive a Golden 80 or Golden 90 pension ("Golden 80/Golden 90") unless they were in covered employment.  FAC ¶ 44.

Plaintiffs here, a class of participants no longer in covered employment but otherwise eligible to qualify for a Golden 80 or Golden 90 pension, sue the Fund and its individual Trustees

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

1

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 3:14-cv-5596 (JST)

1   under the Employee Retirement Income Security Act of 1974 ("ERISA") in an effort to invalidate

2   the Rehabilitation Plan's adoption of a covered employment requirement for Golden 80/Golden

3   90 eligibility.  The amended complaint consists of four counts, which variously allege that the

4   Fund instituted the Rehabilitation Plan Amendment without the notice required by the PPA, that

5   the critical status funding determination was unreasonable and therefore the 2012 Rehabilitation

6   Plan as a whole was impermissible under the PPA, and that the Fund Trustees themselves

7   breached their ERISA fiduciary duties in adopting the 2012 Rehabilitation Plan and implementing

8   the Golden 80/Golden 90 eligibility changes.  As we explain below, the Amended Complaint

9   does not allege facts sufficient to state a claim for ERISA or PPA violations.  Defendants are

10  entitled to judgment on each count, and thus submit this Rule 12(c) motion.

## BACKGROUND

### A.  The History, Nature, and Purpose of the PPA

13          Congress enacted the PPA to counteract the widespread underfunding of ERISA pension

14  plans, which threatened workers' retirement security and ERISA's system for federally insuring

15  multiemployer plans.  *Trs. of Local 138 Pension Trust Fund v. F.W. Honerkamp Co, Inc.*, 692

16  F.3d 127, 130-31 (2d Cir. 2012).  Among Congress's chief concerns were the risk that the

17  pension obligations of insolvent pension plans would be placed on the Pension Benefit Guaranty

18  Corporation ("PBGC"), at that point already in uncertain financial condition, and equally

19  important, the repercussions such pension fund insolvencies would have on pensioners who, even

20  with a PBGC-guaranteed pension, would likely receive only a fraction of the benefits promised

21  by their ERISA pension plan.[1]  *See generally* Munnell & Aubry at 1-2.

22          The underfunding problems affecting the nation's multiemployer pensions became clear

_____

[1] In the event of a multiemployer plan's insolvency, the PBGC will guarantee a pensioner's
benefit, but the guarantee is typically only a fraction of the normal pension benefit.  Alicia
Munnell & Jean-Pierre Aubry, *Can PBGC Save Multiemployer Plans?*, No. 14-16 (Sept. 2014) at
2; *see also* Dept. of Labor, Dept. of Treasury & PBGC, *Multiemployer Pension Plans: Report to
Congress Required by the Pension Protection Act of 2006* (Jan. 2013), at 4 n.6 ("Joint Agency
Report"), *available at* http://www.pbgc.gov/documents/pbgc-report-multiemployer-pension-
plans.pdf; U.S. Gov't Accountability Office, *Timely Action Needed to Address Impending
Multiemployer Plan Insolvencies*, GAO-13-240 (Mar. 28, 2013), at 4-5 ("GAO Report"),
*available at* http://www.gao.gov/assets/660/653383.pdf.

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

2
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 3:14-cv-5596 (JST)

in the early 2000s. "The 2000-2002 market downturn exposed weaknesses in the multiemployer plan funding rules, the effects of which were particularly noticeable for 'mature' plans with a large proportion of retirees and significant unfunded liabilities." Joint Agency Report at 2. Because of ERISA's anti-cutback rule, 29 U.S.C. § 1054(g), plans underfunded as a result of market losses could not cut benefits to restore their financial stability but instead were limited to "*prospective* actions affecting active workers," namely increasing employer contributions and reducing the accrual of future benefits.  Joint Agency Report at 3 (emphasis added).  But, before the PPA, such prospective measures were potentially dangerous, since they would "effectively" amount to "charge[s] imposed on employees' earnings and/or employers' profits," thereby making it "more difficult . . . to attract new employers and employees into the plan." *Id.*  For this reason (among others), the underfunding problems plaguing multiemployer plans got worse.  *See id.* (from 2000 to 2004 multiemployer plan underfunding rose from around $50 billion to more than $200 billion, and the PBGC insurance program's funding became negative).

It was in this context that Congress enacted the PPA, aiming to "impose greater financial discipline on multiemployer plans, while also providing funding relief for plans with moderate and severe funding problems."  Joint Agency Report at 4.  To those ends, the PPA created a new annual certification process based on "standardized measures . . . used to identify multiemployer plans in acute financial distress," *i.e.*, in "endangered," "seriously endangered," or "critical" status. 29 U.S.C. § 1085(b); Joint Agency Report at 4.  The PPA assigns the responsibility of certifying this status to the plan's actuary (rather than the plan administrator or plan sponsor), and it sets various standards for an actuary conducting a certification.  *See* 29 U.S.C. § 1085(b)(3); Joint Agency Report at 36 ("PPA requires the plan's actuary to certify the plan's status within the zones established under PPA"). Congress assigned plan sponsors only one task in connection with this certification—providing relevant information to actuaries concerning the "projection of activity in the industry." 29 U.S.C. § 1085(b)(3)(B)(iii).

When a plan is certified as being in "critical" status, the PPA requires the plan sponsor to develop a "rehabilitation plan" to improve the plan's funding and to forestall insolvency.  *Id.* § 1085(a)(2). In such circumstances, the plan sponsor's obligations include making appropriate

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

3
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 3:14-cv-5596 (JST)

reductions in "adjustable benefits" to ensure the plan remains financially viable to provide basic pension benefits. *Id.* § 1085(a)(2), (e)(8).  Most relevant to this case, the PPA allows reductions to "adjustable benefits" like the Golden 80/Golden 90 pension benefits of a plan in critical status even though those reductions would otherwise be prohibited by ERISA's anti-cutback rule.[2] *Id.* § 1085(e)(8); *see* Joint Agency Report at 46.  The PPA explicitly authorizes special flexibility to reduce the adjustable benefits of participants who, like Plaintiffs, are no longer working for an employer contributing to the plan. 29 U.S.C. § 1085(e)(8)(A)(iii). To monitor compliance with these new plan solvency measures, the PPA includes provisions to enable robust agency oversight. It "bolster[s] disclosure rules" in part "to enable . . . the Department of Labor (DOL), the Internal Revenue Service (IRS), and the PBGC to monitor the response of plans to the new funding requirements." Joint Agency Report at 4; *see also* 29 U.S.C. § 1085(b)(3)(A) (annual certification sent to the Treasury Department, whether the plan is in endangered status or not), (b)(3)(D) (notice of critical status sent to DOL and PBGC), (e)(3)(B)(i) (plan sponsor must file the rehabilitation plan and update such filing annually).The PPA's certification and funding requirements "took effect in 2008 just as the nation was entering a severe economic crisis." GAO Report at 9.

### B.  Factual Allegations

**1. Parties.** The Fund is a multiemployer defined benefit pension plan covering tens of thousands of plan participants. First Am. Compl. ("FAC") ¶¶ 15, 19, 25, 26. It is funded by contributions made by employers on behalf of their active employees. *Id.* ¶ 25. The rules governing plan administration and benefit eligibility are set forth in the Rules and Regulations of the Fund ("Plan Rules"). *See* Dkt. No. 1-2 ("Plan Rules")[3]; *see also* FAC ¶¶ 27-32.  The Board of

---

[2] The fact that ERISA's anti-cutback rule does not allow for reductions to adjustable benefits was, as noted *supra* at 3, one of the factors weighing on multiemployer pension funds' financial health, and was directly addressed in the PPA. This PPA exception to the anti-cutback rule crystallizes the irrelevance to *this* case of prior litigation over Golden 80/Golden 90 eligibility, for that litigation turned entirely on the propriety of prior Fund amendments that *were* subject to the anti-cutback rule.  *See generally Alcantara v. Bakery & Confectionery Union & Indus. Int'l Pension Fund Plan*, 751 F.3d 71 (2d Cir. 2014); *see also* FAC ¶¶ 34-35.

[3] On this Rule 12(c) motion, we assume the truth of Plaintiffs' allegations unless contradicted by "matters properly subject to judicial notice or by exhibit."  *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014).  In this regard, the court may "consider certain

**WEINBERG, ROGER &**
**ROSENFELD**
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

4
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 3:14-cv-5596 (JST)

Trustees of the Fund is the plan sponsor as well as the administrator, and has authority to formulate rules, regulations, and policies for the Fund's administration. FAC ¶ 16; Plan Rules § 8.04. Named plaintiffs are plan participants who previously worked in covered employment. FAC ¶¶ 4-14. Individual Defendants are current or former Trustees. *Id.* ¶ 17.

**2. Pertinent Plan Provisions.** Under the Fund's standard rules, a participant becomes eligible to receive a full pension if he or she works in covered employment for 25 or more years and reaches the retirement age of 65. Plan Rules §§ 4.01, 1.15. A participant who worked the requisite period may retire before 65 with a reduced monthly pension. *Id.* §§ 4.05-.06. In addition to these normal and reduced pensions, the Fund offers the Golden 80 and Golden 90 plans to bargaining units and employers that agree to a higher contribution rate, *id.* §§ 4.17-.18, 4.23-.24, 4.26(d) & (g).  As described above, these plans permit a pension benefit to begin before normal retirement age without any reduction, if the sum of a participant's age and years of pension credit equals or exceeds 80 (or, in the case of the Golden 90 plan, 90).  *Id.* at §§ 4.17-.18, 4.23-.24.

Before 2010, the Fund permitted participants to "age into" their Golden 80 or 90 benefits. That is, a participant could leave covered employment before the sum of her age and service met the 80- or 90-year threshold and still receive the full benefits when, later, the sum of years was met as the participant aged.  For example, a 54 year-old participant with 25 years of service could leave covered employment and, one year later, "age into" eligibility for a full pension.  In 2010,

---

materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion . . . into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  This rule extends to documents "not explicitly incorporated" in a complaint so long as the document is "crucial" to the claim. *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *superseded by statute on other grounds as recognized in Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 681 (9th Cir. 2006).  Applying these standards to Plaintiffs' allegations and claims, a number of documents fall into the category of materials crucial to Plaintiffs' claims or relied on by the Complaint, including the following: the Rules and Regulations (*see* FAC ¶¶ 27-32, 82), the 2012 Critical Status Certification (*see id.* ¶¶ 67-69), the Notice of Critical Status (*see id.* ¶¶ 37-39), the Annual Funding Notice (*see id.* ¶ 37), the November 2012 Rehabilitation Plan (*see id.* ¶¶ 43-44, 83-84), and the November 2012 notice to employers and local unions (*see id.* ¶ 46).  Most such documents were attached to the original complaint and may be considered by the Court in resolving this motion, *United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011) ("[w]e may . . . consider materials that are submitted with and attached to the complaint"); the rest are authenticated in, and attached to, the accompanying Declaration of John Beck in Support of Judgment on the Pleadings ("Beck Decl.") ¶¶ 2-3 & Exs. A-B.  *See also* note 4 *infra*.

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

1    the Board of Trustees adopted an amendment which retained the Golden 80 and 90 benefits but

2    eliminated the right of participants to "age into" them after leaving covered employment. FAC ¶

3    33. This amendment was challenged in a number of suits and ultimately invalidated by a district

4    court in June 2012, *id.* ¶¶ 34-36, 42, a judgment the Second Circuit affirmed in May 2014, *id.* ¶

5    48. *See Alcantara, supra* at n. 2.

6        **3.  Actuary's Critical Status Certification and the Rehabilitation Plan.**  In March

7    2012, the plan's actuary, The Segal Group ("Segal"), certified the Fund as being in "critical"

8    status.  *See* Beck Decl., Ex. A ("2012 Certification"); *see supra* note 3. Segal noted there were

9    6,630 fewer active participants "as a result of a significant employer no longer contributing to the

10   Fund." *Id.* at 7; *see generally In re Hostess Brands, Inc.*, 499 B.R. 406 (S.D.N.Y. 2013) (allowing

11   Hostess to reject in bankruptcy Fund's $919,806,165 withdrawal liability claim).  Segal affirmed

12   that the certification was "in accordance with generally accepted actuarial principles," and that, in

13   its opinion, the "projections [were] based on reasonable actuarial estimates, assumptions and

14   methods." 2012 Certification at 1.  Segal determined that the Fund was in critical status for 2012

15   because (a) there would be a funding deficiency within five years; (b) the "present value of vested

16   benefits for non-actives [is] more than [the] present value of vested benefits for actives"; and (c)

17   the Fund's "normal cost plus interest on unfunded actuarial accrued liability . . . [is] greater than

18   contributions for [the] current year." *Id.* at 3; *see also* 29 U.S.C. § 1085(b)(2)(C).

19       In April 2012, the Fund sent participants a Notice of Critical Status, as required by the

20   PPA, informing them that the Fund actuary certified to the Trustees and to the Department of the

21   Treasury that the plan was in critical status for the 2012 plan year.  *See* FAC ¶ 37; Dkt. No 1-4 at

22   1 ("Notice of Critical Status"); *see also* 29 U.S.C. § 1085(b)(3)(D). The Fund further advised

23   participants that it was required to adopt a rehabilitation plan that might eliminate or reduce

24   "adjustable benefits," including Golden 80 and 90 pensions. Notice of Critical Status at 1.

25   Thereafter, the Board of Trustees developed the Rehabilitation Plan, which was then adopted on

26   November 7, 2012.  FAC ¶ 44; Dkt. No. 1-5 at 2.  Among the Rehabilitation Plan's reductions in

27   "adjustable benefits" was an amendment ending the ability of participants to age into the Golden

28   80 and 90 benefits.  Dkt. No. 1-5 at 8; FAC ¶ 44.

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

6

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 3:14-cv-5596 (JST)

1  On November 14, 2012, as directed by the PPA, *see* 29 U.S.C. § 1085(e)(8)(C)(i), the

2  Fund promptly sent notices to participating employers and local unions apprising them of the

3  Rehabilitation Plan.  FAC ¶ 46; Dkt. No. 1-6 ("Employer-Union Notice").  On the same day, the

4  Fund *also* sent a distinct and more detailed notice to participants advising them of the reductions

5  in adjustable benefits, including the changes to the Golden 80/Golden 90 eligibility requirements

6  at issue in this case.  Beck Decl., Ex. B ("Participant Notice").  *See infra* at 11-13.[4]

7  **ARGUMENT**

8  The Court, on a Rule 12(c) motion for judgment on the pleadings, applies a standard

9  substantially identical to reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Keum v.*

10  *Virgin America, Inc.*, 781 F. Supp. 2d 944, 947-48 (N.D. Cal. 2011).  Under both provisions the

11  Court must determine whether, assuming the truth of the non-movant's well pled allegations,

12  plaintiffs "state a claim to relief that is plausible on its face." *Id.* at 948 (quoting *Bell Atlantic*

13  *Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Of course, plausible claims require more than

14  merely asserting that a statute has been violated, and "'[t]hreadbare recitals of the elements of a

15  cause of action, supported by mere conclusory statements, do not suffice.'" *Keum,* 781 F. Supp.

16  2d at 948 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009)); *see also Cousins v. Lockyer*, 568

17  F.3d 1063, 1067 (9th Cir. 2009) ("conclusory allegations of law and unwarranted inferences are

18  insufficient to avoid" dismissal) (quotation omitted).  And, as noted above, although the Court

19  accepts as true the non-conclusory well pled allegations of the complaint, it does "not accept as

20  true allegations that contradict matters properly subject to judicial notice or by exhibit."

21  *Gonzalez*, 759 F.3d at 1115.

22  While this action challenges the 2012 Golden 80/Golden 90 pension amendments,

23  Plaintiffs do not—and could not—dispute that these are the type of adjustable benefits which,

24  under the PPA, may be reduced through a Rehabilitation Plan.  *See* 29 U.S.C. § 1085(e)(8)(A)(i),

25  _____

26  [4] Because the notice to participants is at the heart of Plaintiffs' PPA notice claim, the Court may consider the document constituting the notice on this Rule 12 motion.  *See, e.g.*, *Peel v. Brooksamerica Mortgage Corp.*, 788 F. Supp. 2d 1149, 1158 (C.D. Cal. 2011) ("if a document

27  forms the basis of a plaintiff's complaint," the court "'may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss

28  under Rule 12(b)(6)'") (quoting *Ritchie*, 342 F.3d at 908); *see also infra* at 9.

**WEINBERG, ROGER &**
**ROSENFELD**
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

7
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 3:14-cv-5596 (JST)

1    (iv).  Instead, the Amended Complaint initially attacks the notice of the amendments to

2    participants and, secondarily, the Fund's right to adopt any rehabilitation plan, and further

3    challenges Defendants' right to implement the eligibility changes by amending the Plan.  None of

4    the four counts of the Amended Complaint states a viable claim.

5                    **A.  Defendants Are Entitled to Judgment on Count I**

6            In Count I, Plaintiffs contend that the 2012 Rehabilitation Plan's provision requiring that,

7    beginning April 30, 2012, participants must be in covered employment to become eligible for

8    Golden 80/Golden 90 pensions is unenforceable because the Fund failed to provide participants

9    adequate notice of the change.  More specifically, Plaintiffs contend (a) that "Adjustable benefits

10   [such as the Golden 80/Golden 90 pensions] . . . cannot be reduced for participants who have not

11   received timely notice of *actual* reduction of benefits under ERISA § 305(e)(8)(C)," FAC ¶ 60

12   (emphasis in original); and (b) that "[a]t no time during the period between April 27, 2012—when

13   the Notice of Critical Status was mailed—and May 23, 2014—when the Second Circuit issued its

14   Mandate affirming the illegality of the 2010 Amendment" did the Fund "inform the Class that the

15   Contingent Amendment had become or was in any way an operative part of the Fund," and "that

16   between May 23, 2014, and the filing of this Complaint no additional notices about the

17   Rehabilitation Plan or its amendments have been sent to plan participants."  *Id.* ¶¶ 50, 53.

18   Therefore, Plaintiffs assert that "Defendants have not complied with ERISA's notice

19   requirements for the reduction of benefits under ERISA § 305," *id.* ¶ 61.

20           To be sure, the PPA does contain notice provisions relating to plans in critical status.

21   First, the PPA requires a plan to provide notice of its actuary's critical status certification to

22   participants and others "not later than 30 days after the date of the certification."  29 U.S.C. §

23   1085(b)(3)(D)(i).[5]  Indeed, no benefit reductions may be imposed as to benefits commenced prior

24   to the date of the critical status certification notice.  29 U.S.C. § 1085(e)(8)(A)(ii).  Second, once

25   a plan adopts a rehabilitation plan as required after receiving the critical status certification, *see*

26   *id.* § 1085(e)(1), it must also provide notice of adjustable benefit reductions before implementing

---

[5] The Amended Complaint asserts no PPA violation based on any alleged inadequacy of the critical status notice.

27

28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

8
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 3:14-cv-5596 (JST)

1  them, *see id.* § 1085(e)(8)(C)(i).  The rehabilitation plan notice provision lists three distinct

2  classes of recipients to whom notice must be sent: plan participants, contributing employers, and

3  participating unions.  *See id.* § 1085(e)(8)(C)(i)(I)-(III).

4  Oddly, although the claim in Count I depends on the inadequacy of the notice to

5  participants regarding the Rehabilitation Plan changes to the Golden 80/Golden 90 pension, it

6  does not allege that the Fund failed to provide any notice to participants of the Rehabilitation Plan

7  provisions, or that plaintiffs themselves did not receive the required participant notice of

8  Rehabilitation Plan changes from the Fund.  This is understandable, though, because, as noted

9  above, *see supra* at 7, the Fund *did* provide a specific rehabilitation plan notice to participants.

10  Instead, the Amended Complaint's contentions that the notice of changes to the Golden

11  80/Golden 90 pension was inadequate under the PPA refer only to *other documents* that even

12  Plaintiffs do not allege were intended as the PPA-required participant notice.  *See* FAC ¶¶ 44, 46,

13  50, 62.  But Plaintiffs may not support this claim simply by referencing *only* documents not

14  relevant to their notice claim—such as the notice to contributing employers, *see* FAC ¶ 46, while

15  ignoring the crucial notice document directed to participants themselves.  *See Peel*, 788 F. Supp.

16  2d at 1158 (the reason a court may consider documents forming the basis of plaintiff's claim on a

17  motion to dismiss is in order to prevent plaintiffs "'from surviving a Rule 12(b)(6) motion by

18  deliberately omitting references to documents upon which their claims are based'" (quoting

19  *Parrino*, 146 F.3d at 706)).

20  But, even considering only the documents Plaintiffs explicitly reference or quote in the

21  Amended Complaint, the notice claim fails because the premise Plaintiffs allege, namely that the

22  Rehabilitation Plan eligibility reductions to the Golden 80/Golden 90 pension were merely

23  "contingent" at the time of the Rehabilitation Plan adoption, and that, therefore, the Fund was

24  required later to send another formal notice of the benefit reductions after the Second Circuit's

25  decision, is implausible on its face.  Moreover, upon review of the actual notice to participants, it

26  is doubly clear that Plaintiffs could not state a PPA participant notice violation claim.

27  1.  Although Plaintiffs ignore the document constituting the notice of Rehabilitation

28  Plan amendments required under § 305(e)(8)(C), the documents upon which the Amended

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

Complaint explicitly relies contradict the allegation that the Golden 80/Golden 90 eligibility amendment was only "contingent" at the time the provisions were enforced. First, the Rehabilitation Plan itself states that "Participants who had not yet reached the combination of age and service required to be eligible for a Golden 80 or Golden 90 pension *as of April 30, 2012, will not be permitted* to age into the Golden 80 or Golden 90 benefit after leaving covered employment." Dkt. No. 1-5 (Rehabilitation Plan) at 8 (emphasis added); *see also id.* at 20-21 (same). There is nothing conditional or contingent about this language. And the parenthetical in the Rehabilitation Plan that follows this unconditional language—which apparently forms the heart of the Plaintiffs' notice claim argument, *see* FAC ¶¶ 1, 44—merely explains why the Rehabilitation Plan included an amendment that was identical to the 2010 amendment in all respects except the effective date; it does not purport to alter the unconditional sweep of the text.

Second, consider the notice sent to unions and employers, which the Amended Complaint references and thereby incorporates, *see* FAC ¶ 46: this notice includes materially identical language to that in the Rehabilitation Plan. *See* Dkt. No. 1-6 (Employer-Union Notice) at 3 & n.1; *see also id.* at 12 & n.6 (stating in terms that participants not in covered employment after April 29, 2012 will not be eligible for Golden 80/Golden 90 pensions and further relegating the parenthetical language to a footnote, noting that "the rule change was initially effective July 1, 2010, *and is readopted under this Rehabilitation Plan* as a contingent measure because of pending court challenges to that initial amendment. If the initial amendment is upheld, the initial effective date of July 1, 2010 will govern." (Emphasis added)). Plaintiffs' reading of "contingent amendment" to argue that this notice did not intend to impose a covered employment requirement for Golden 80/Golden 90 pension eligibility after April 29, 2012, *regardless* of the 2010 Amendment litigation, is not plausible.[6]

---

[6] One might consider the alleged "contingent" notice as akin to the "belt and suspenders" cliché. If one, while getting dressed in the morning, puts on suspenders and, upon noticing that they are frayed, also a belt, and in the afternoon the suspenders snap, the previously redundant belt becomes the tool for holding up the pants. One could say that the belt was put on in the morning as a "contingent measure," but it could not plausibly be asserted that the belt was put on in the *afternoon* when the suspenders snapped. Yet that is the essence of Plaintiffs' claim, conflating actual and concrete steps taken to *prepare* for future contingencies (*e.g.*, putting on a belt *in case* the suspenders later snapped, or the Trustees' including the Golden 80/90 amendment in the

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

10

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 3:14-cv-5596 (JST)

1    Because Plaintiffs' reading of the Rehabilitation Plan's description of the Golden

2    80/Golden 90 eligibility amendment is simply implausible, as is their reading of the notice to

3    employers and unions, Count I fails.

4        2.    While dispositive, the foregoing is not the only, or even the most important, defect

5    in Plaintiffs' notice claim.  Count I fails also because the Amended Complaint does not even

6    allege that the Rehabilitation Plan or the notice to employers and unions constituted the defective

7    notice to participants.  *See* FAC ¶¶ 44, 46.  Indeed, the Amended Complaint nowhere alleges that

8    Defendants failed to send the required rehabilitation plan notice to the Fund's participants

9    pursuant to subsection (e)(8)(C)(i)(I), or that participants received no notice.  A court cannot

10   assume that a plaintiff "can prove facts . . . not alleged." *Associated Gen. Contractors of Cal., Inc.*

11   *v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983); *see also Jack Russell Terrier*

12   *Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1035 (9th Cir. 2005). And while a

13   court must draw inferences in a plaintiff's favor from the nonconclusory factual allegations in a

14   complaint, only *reasonable* inferences may be drawn.  *In re Gilead Sciences Sec. Litig.*, 536 F.3d

15   1049, 1055 (9th Cir. 2008).  Here—where a material fact is not pled and the factual allegations

16   that are pled do not permit a reasonable inference of the missing fact (*i.e.*, failure to issue a

17   rehabilitation plan notice to participants)—the complaint states no claim.  *See, e.g.*, *King v. Bd. of*

18   *Trs. of Cal. State Univ.*, No. 14-5020, 2015 WL 1519268, at *2 (N.D. Cal. Apr. 2, 2015); *see also*

19   *Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 643-46 (9th Cir. 2014) (affirming dismissal of

20   minimum-wage claim that failed to allege that the plaintiff worked over forty hours in a

21   workweek without overtime compensation).

22       Because the Amended Complaint does not allege that *no* notice of benefit reductions

23   adopted by the Rehabilitation Plan was provided to participants, all that remains is Plaintiffs'

24   hope that the Court could infer from the allegations that the notice that was provided was

25   inadequate under the PPA.  *See supra*  at 9-11.  But, to the extent Plaintiffs seek to imply that the

26   ─────────────────────────────────────────

Rehabilitation Plan *in case* the July 2010 amendment were finally invalidated) with actions that
either will or will not be taken depending on future contingencies (*e.g.*, if one decided to place a
belt in his backpack to put on *if* the suspenders broke, or if the Trustees had decided to amend the
plan *only after* the Second Circuit affirmed the invalidation of the July 2010 amendment).

**WEINBERG, ROGER &**
**ROSENFELD**
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

*substance* of the required participant notice was deficient under PPA § 305(e)(8)(C), the Court is entitled to consider the *actual notice* to participants. *See Peel*, 788 F. Supp. 2d at 1158.  That document's language, even more clearly than the Rehabilitation Plan's, informs participants that as of April 30, 2012, they must be in covered employment to be eligible for a Golden 80/Golden 90 pension.

The PPA sets out guidelines regarding the form and content of the rehabilitation plan notice to participants.  *See*, *e.g.*, 29 U.S.C. § 1085(e)(8)(C)(ii) (requiring that the notice to participants contain "sufficient information to enable *participants and beneficiaries* to understand the effect of any reduction" and information about the "rights and remedies of plan *participants and beneficiaries*"); *id.* § 1085(e)(8)(C)(iii)(II) (notice "shall be written in a manner so as to be understood by the average *plan participant*") (emphasis added).  In relevant part, the notice to participants here stated:

> *In no case* . . . will anyone whose age and service had not yet reached a total of 80 (or 90) by April 30, 2012, become eligible for Golden 80 or Golden 90 benefits after leaving covered employment except by returning to covered employment as the rule specifies.

Beck Decl., Ex. B at 18 (emphasis added).  The notice of these adjustable benefit reductions thus states in express terms that the reductions are effective, as permitted by § 305(e)(8)(A)(ii), to participants whose commencement dates were after April 29, 2012, a date, after the critical status notice was provided to participants; as described in the notice, there is nothing even arguably "contingent" about the fact that after that date participants may not "age into" the Golden 80/Golden 90 pension.  Plaintiffs thus have alleged no cognizable PPA notice violation.

Plaintiffs cannot have it both ways. Either they are challenging the specific content of the November 14, 2012 notice to participants as failing to notify participants of an actual, non-contingent benefit reduction, or they are not. If they are, the Court can consider the actual notice, the plain text of which defeats Plaintiffs' claim outright.  If Plaintiffs are not so arguing, the allegations are insufficient to make out a plausible PPA claim because the notice requirements, even on Plaintiffs' allegations, *see* FAC ¶ 60, apply *only* to the notice to *participants*, and Plaintiffs' allegations regarding descriptions of the Golden 80/Golden 90 benefit reductions

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

12
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 3:14-cv-5596 (JST)

pertain only to the notice to employers and unions, *not* the notice to participants—and in any event constitute an implausible reading of the documents Plaintiffs directly incorporate in their pleading.

### B.  Defendants Are Entitled to Judgment on Count II

Above, we explained that the upon certification by the plan actuary that a plan is in "critical status," as defined by the statute, the PPA *mandates* the plan sponsor to adopt a Rehabilitation Plan, including making any necessary reductions to adjustable benefits like the Golden 80/Golden 90 pensions.  *See supra* at 3-4; 29 U.S.C. § 1085(e).  As alleged in the Amended Complaint here, in 2012 the Fund *was* certified to be in critical status and the challenged Golden 80/Golden 90 pension amendments were part of the Rehabilitation Plan adopted in November 2012 as a consequence of the Critical Status Certification.  FAC ¶¶ 37-39, 44.  In Count II of the Amended Complaint, Plaintiffs make a sweeping attack on the entire Rehabilitation Plan because "[t]he certification by the Fund of its critical status fails to comply with the standards set forth  in [29 U.S.C. § 1085(b)]."  *Id.* ¶ 67.  This legal conclusion is supported entirely and solely by two additional paragraphs.  In the first, Plaintiffs allege that "[t]he actuarial assumptions applied, including the assumption regarding the interest rate, mortality, and projected hours, are not reasonable, as required by 29 U.S.C. §§ 1084(c)(2)(A) and (3)," which, the allegation continues, "resulted in the undervaluation of the Fund's funding status."  FAC ¶ 68.  The complaint, however, alleges no *facts* from which one could infer what about any of the actuarial assumptions is in fact unreasonable.  In the second paragraph, Plaintiffs allege that "[t]he Fund's projected accumulated funding deficiency does not occur for five years, or until 2017, which is a longer period of time than set forth in the criteria for establishing critical status in 29 U.S.C. § 1085(b)(2).  *Id.* at ¶ 69.

As we show below, Count II should be dismissed because allegations that the actuarial assumptions are not "reasonable," as required by the PPA, are based only on bald conclusions that on a Rule 12(c) motion Courts do not assume to be true, and because allegations regarding the projected funding deficiency simply misread the actuarial document integral to the claim that is incorporated into the Amended Complaint.  Separately, the theory on which Plaintiffs contend

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

13

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 3:14-cv-5596 (JST)

Defendants violated the PPA critical status certification process rests on a fundamental misunderstanding of how the PPA § 305 funding certification process works; the violations of PPA duties for which Plaintiffs seek to hold the Defendants responsible are almost entirely committed to the expert judgment of the Fund actuaries.  It is thus unsurprising that in the years since the PPA was enacted not one reported case has asserted this theory of liability against a multiemployer pension plan or the plan sponsors, much less prevailed on it.  For each of these independent reasons, Defendants are entitled to judgment on this claim.

1. Count II contains only legal conclusions and allegations contrary to the document on which the claim relies.

In determining the funding status of a multiemployer plan, the plan actuary must "value [] the plan's assets . . . on the basis of any reasonable actuarial method of valuation which takes into account fair market value and which is permitted under regulations prescribed by the Secretary of the Treasury," and must similarly determine plan liabilities, costs, and rates of interest based on reasonable assumptions.  29 U.S.C. § 1084(c)(2)(A), (3)(A).  Plaintiffs' allegation in Count II does nothing more than articulate the legal standard for funding certifications and tack on a conclusory contention that the "actuarial assumptions . . . [were] not reasonable."  FAC at ¶ 68.  If Plaintiffs had pled underlying *facts* to support the recitation of the legal standard, the Court would need to credit such facts and determine whether such facts and any legitimate inferences therefrom could state a plausible claim that the actuary's critical status funding certification was invalid.  Under Fed. R. Civ. P. 8, however, the mere assertion that the actuarial assumptions were "unreasonable" does not constitute a cognizable claim that Defendants violated the PPA.

A court considering a motion to dismiss may begin "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Iqbal,* 556 U.S. at 679; *see also Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994) ("[t]he court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged").  As the Ninth Circuit has

14

WEINBERG, ROGER & ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

previously stated, "formulaic recitation[s]" of the elements of a claim "are not to be discounted because they are unrealistic or nonsensical, but rather because they do nothing more than state a legal conclusion—*even if that conclusion is cast in the form of a factual allegation*."  *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969, 970 (9th Cir. 2009) (emphasis added) (quotation omitted) (dismissing complaint which merely alleged that defendants acted with impermissible motive as part of a policy to suppress critical speech "without *any* factual content to bolster it," as "just the sort of conclusory allegation that the *Iqbal* Court deemed inadequate, and thus does nothing to enhance the plausibility of the Plaintiffs' viewpoint discrimination claim" (emphasis in original) (citation omitted)).  So here, Plaintiffs' allegation of "unreasonableness" which merely parrots the PPA's statutory requirements for actuarial assumptions without alleging any *facts* to support or describe the putative "unreasonableness" of the assumptions, constitutes exactly the type of pleading that *Iqbal* and *Moss* identified as inadequate to sustain a claim.  *See also generally Johnson v. CMC Prop. Leasing, Inc.*, No. 12-1309-SAC, 2012 WL 6025601, at *4 (D. Kan. Dec. 4, 2012) (dismissing claim because complaint did not set forth factual allegations bolstering conclusory allegation of defendant's "unreasonableness").

That leaves Paragraph 69, which alleges that the Fund's projected funding deficiency does not occur for five plan years, when under the circumstances of this critical status determination, the PPA requires the funding deficiency to occur within four plan years.  FAC ¶ 69; *see* 29 U.S.C. § 1085(b)(2)(C).  If the allegations of paragraph 69 could be accepted as well pled facts, then the Court might infer that the Critical Status Certification was flawed (whether or not that would state a claim against Defendants here is another matter, *see infra* at 16-21); however, given that the allegations of this paragraph merely reference and incorporate the Fund's actuarial certification itself (*see* ¶¶ 67-69), and that document directly contradicts the allegations, it is *not* a well pled fact that the Court is required to credit on this motion on the pleadings.  *See, e.g., Gonzalez v.*

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

15
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 3:14-cv-5596 (JST)

1  *Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014) (Courts "need not . . . accept as

2  true allegations that contradict matters properly subject to judicial notice or by exhibit.")

3  (quotation omitted); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (court

4  may ignore "conclusory allegations which are contradicted by documents referred to in the

5  complaint").  Here, the March 30, 2012 certification which Count II references, *see* ¶ 67, and on

6  which it necessarily relies, expressly states that, in 2012, the funding deficiency was projected to

7  occur first in *2016*—not 2017—which was within the five-year period specified in § 305(b)(2).

8  *See* Beck Decl., Ex. A at 3, 5.  As such, the allegation of the Fund's actuarial funding deficiency

9  projections asserted in paragraph 69 contradicts the document on which it relies and cannot

10  support Count II's necessary predicate, *i.e.*, that the Critical Status Certification—which was

11  itself the predicate for the challenged Rehabilitation Plan amendment—was invalid.

12      In sum, Count II asserts that the 2012 "critical status" certification was impermissible but

13

14  offers no nonconclusory factual allegations to support this assertion.  It must be dismissed.

15

16      2.   The premise of Count II's claim against the Defendants is contrary to the PPA

17      While the Plaintiffs' failure even to plead facts sufficient to allow the Court to doubt the

18  appropriateness of the critical status funding determination alone dooms Count II, the claim is

19  contrary to the fundamental purpose of the PPA's funding certification provision—to identify and

20  compel the improvement of financially distressed pension plans.  Section 305 of the PPA is

21  structured to require quick and decisive steps by a plan sponsor (here the Fund trustees) as soon

22  as the plan's *actuary* certifies critical status.  The statute leaves no room for the sponsor to

23  second-guess the actuary on judgments the PPA entrusts to actuarial expertise.  Thus, to impose

24  liability on a plan or its trustee sponsors for the plan actuary's purported failures would frustrate

25  the PPA's balanced framework, and would ignore PPA § 305's basic structure and the measures

26  Congress included to allow effective regulatory oversight of actuaries' certifications.

27      This being so, it is doubtful that a *post hoc* participant challenge to a § 305(b) certification

28  can be brought at all; but even in the unlikely event that it could be brought, a proper regard for

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

16

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 3:14-cv-5596 (JST)

the PPA's considered legislative scheme must at a minimum limit the scope of such challenges in two key respects: first, a plan sponsor cannot be sued under § 305(b) except for violating *its own duty* to "act reasonably and in good faith" in its limited role of providing the actuary with industry information under § 1085(b)(3)(B)(iii); and, second, any claim of an improper actuarial funding certification must, consistently with the PPA's structure and purpose, be evaluated under the deferential standard of review ERISA reserves for like plan decisions. *See infra* at 19-20.   Hence, even were Plaintiffs able to plead facts plausibly asserting a defective actuarial funding certification—which they cannot—they seek to advance a novel claim against Defendants here, ignoring Congress's purpose in structuring the PPA requirements as it did.

**(a)**   In order to effectuate its purpose of protecting the long-term financial stability of pension plans, the PPA lays out "a number of mechanisms aimed at stabilizing pension funds and ensuring that they remain solvent." *F.W. Honerkamp Co.*, 692 F.3d at 130; *see McGuigan*, 2011 WL 3421318, at *5 n.8 ("Congress passed the PPA in large part to address the declining financial health of single- and multiemployer pension plans across the country."). Among these mechanisms is the two-step process established by § 305: first, it requires that a plan's actuary annually certify the financial health of the plan. *See*  29 U.S.C. § 1085(b).  Second, if the actuary certifies the plan to be in critical status, it mandates the plan sponsor to take immediate steps to reduce benefits and increase employer contributions by formulating and adopting a rehabilitation plan within a short timeline. *See id.* § 1085(e).

A "fair reading of legislation demands a fair understanding of the legislative plan." *King v. Burwell*, 135 S. Ct. 2480, 2496 (2015).  The PPA's "legislative plan," as explained below, includes four distinct but interdependent provisions—namely, (i) Congress assigned all but one of the certification duties under § 305 exclusively to the plan's actuary; (ii) the plan sponsor's duty to develop a rehabilitation plan is triggered by the *fact* of the plan actuary's certification, and leaves the plan sponsor no discretion to ignore it; (iii) once there has been an actuarial critical-status certification, the PPA requires plan sponsors to send notice and adopt a rehabilitation plan on an expedited schedule to which they must adhere or face suit by employers; and (iv) Section 305 provides important federal administrative oversight of the actuarial certification.

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

17
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 3:14-cv-5596 (JST)

**First**, Section 305 carefully divides the duties it establishes between those applicable to plan *actuaries* and those applicable to plan *sponsors*. Actuaries (not sponsors) are responsible for the annual funding certification, *see* 29 U.S.C. § 1085(b), and sponsors (not actuaries) are responsible for the remaining duties under § 305, including, if triggered by the certification, sending proper notice and formulating a funding improvement or rehabilitation plan, *see id.* § 1085(b)(3)(D), (c)-(f). Congress's decision to entrust certification to the plan actuary, and to establish standards for the actuary, is clear from the statutory text: "*In making the determinations and projections under this subsection*, the *plan actuary* shall make projections required for the current and succeeding plan years . . . . The *actuary's* projections shall be based on reasonable actuarial estimates, assumptions, and methods that. . . offer the *actuary's* best estimate of anticipated experience under the plan." *Id.* § 1085(b)(3)(B)(i) (emphasis added).  Indeed, Congress described certification as the *actuary's* responsibility no fewer than seven times in the subsection (b), which regards the critical status determination. *See id.* § 1085(b)(1), (b)(2), (b)(3) (paragraph heading), (b)(3)(A), (b)(3)(B)(i), (b)(3)(B)(ii), (b)(3)(C).[7]

**Second**, it is the *actuary's* funding certification that triggers the plan sponsor's subsequent duties.  Except for providing industry information to the actuary, as required by § 1085(b)(3)(B)(iii), a plan sponsor's obligations under § 305 are entirely contingent on whether the plan actuary certifies the plan in critical (or endangered) status.  But when the actuary certifies critical status, the plan sponsor must send timely notices, *id.* § 1085(b)(3)(D), (e)(8)(C), must develop and adopt a rehabilitation plan, *id.* § 1085(e)(1), and must formulate one or more "schedules" of financial reform measures that include "reductions in future benefit accruals and

---

[7] Two exceptions underscore that Congress knew how to impose responsibility on others for an actuary's obligations when it wished.  First, while generally designating the actuary as responsible for the certification, Congress *did* prescribe a limited role for the plan sponsor: to provide information to the actuary concerning the projection of industry activity, and to "act reasonably and in good faith" in that function.  29 U.S.C. § 1085(b)(3)(B)(iii).  That Congress created a limited duty in this narrow circumstance belies the conclusion that plan sponsors have some broad, overarching responsibility in § 305 to ensure the reasonableness or accuracy of *other* assumptions or responsibilities entrusted to the actuary.  Second, Congress provided that any "failure of the plan's actuary to certify the plan's status" by the deadline "shall be treated . . . as a failure by the plan administrator to file the annual report," and subject it to civil penalties under ERISA § 502(c)(2), 29 U.S.C. § 1132(c)(2).  *Id.* § 1085(b)(3)(C).

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

18
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 3:14-cv-5596 (JST)

adjustable benefits, and increases in contributions," *id.* § 1085(e)(1)(B), (3). Importantly, Congress was careful to specify that § 1085(e)'s machinery, with all its plan sponsor duties, is set in motion by the *actuary's certification*. *See id.* § 1085(b)(2) (a plan "is in critical status . . . if, *as determined by the plan actuary under paragraph (3)*, the plan" meets one of the four sets of statutory criteria (emphasis added)); *see also id.* § 1085(a)(2), (e)(1) (using the "in critical status" language that (b)(2) defines). Thus, a plan is "in critical status" not as measured in the abstract, but rather "as determined by the plan actuary," *id.* § 1085(b)(2). The triggering event is thus the *fact* of the actuary's certification.

**Third**, once the actuary has certified critical status, not only must the plan sponsor perform a wide range of tasks, it must do so within a short time window.  The plan sponsor has 30 days after the certification to send notice of critical status, *see id.* § 1085(b)(3)(D)(i), no more than 240 days after the required certification date to adopt a rehabilitation plan, *see id.* § 1085(e)(1)(A), and 30 days thereafter to provide schedules to the bargaining parties. *id.* § 1085(e)(1)(B). Congress viewed the rehabilitation-plan deadline, in particular, as important enough to create a new cause of action in ERISA § 502(a)(10) by which contributing employers and participating unions can sue plan sponsors for failing to meet the deadline.[8]

**Fourth**, Section 305 provides for active regulatory oversight. The Secretary of the Treasury is one of the two designated recipients of the actuary's certification (the other being the plan sponsor, who, as just discussed, has elaborate statutory duties triggered by the certification). 29 U.S.C. § 1085(b)(3)(A). The notice of critical status is sent to the Secretary of Labor and to the PBGC (as well as to participants and bargaining parties). *Id.* § 1085(b)(3)(D). And updates to the Rehabilitation Plan must be filed annually with the Secretary of Labor along with the plan's annual report. *Id.* § 1080(e)(3)(B).  Such administrative oversight by agencies with expertise assuages any concern Congress might have had concerning improper certifications.

**(b)**  These features of § 305 imply two limitations to any *post hoc* participant challenge to a critical-status certification.  At the outset, the PPA does not contemplate *plan* or *plan sponsor*

---

[8] ERISA § 502(a)(10) allows employers to compel creation of a rehabilitation plan or, if a rehabilitation plan already exists, the plan's compliance with such plan. 29 U.S.C. § 1132(a)(10).

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

liability for an alleged failure by the plan *actuary* to apply reasonable actuarial methods or assumptions.  As we explained, Congress carefully divided responsibilities under § 305 between plan actuaries and sponsors, and it plainly understood how to make others responsible for an actuary's failures when it wanted. *See* note 7, *supra.*  Congress's decision not to make plan sponsors vicariously liable for the actions of the plan actuaries must be respected.

In addition, because allowing challenges that second guess the Critical Status Certification in the manner advanced by Plaintiffs would have broad consequences, one must tread lightly in implying plan sponsor liability. Count II, for example, asks the Court to undo just one aspect of the Rehabilitation Plan, but the omelet is not so easily unscrambled.  A ruling that the Fund was not in critical status would affect more than the amendment to Golden 80 and 90 eligibility rules. The *entire* Rehabilitation Plan would be invalidated.  The effect of revisiting critical status certifications and thereby reversing carefully calibrated rehabilitation plan financial decisions, including increased employer contributions and reduced or eliminated adjustable benefits could be catastrophic, putting in jeopardy the core pensions of *all* of a multiemployer plan's participants.  That Congress implicitly intended such a result cannot be lightly inferred, particularly given the backdrop of Congress's intent to enact this provision to arm plan sponsors with tools to improve the finances of struggling plans.  It is thus appropriate, as with similar multiemployer plan trustee decisions, to afford broad deference and not "second guess the[ir] good faith discretionary judgments." *See Souza v. Trs. of W. Conference of Teamsters*, 663 F.2d 942, 946-47 (9th Cir. 1981) (deferring to trustees where their choices, in particular which amortization schedules to use, regarded "highly technical portions of a multi-faceted pension arrangement").  Plaintiffs allege no facts on this at all, and none that could overcome such deference, whether committed to the plan sponsor or to the actuary.[9]

---

[9] Moreover, PPA liability of the type Plaintiffs assume would put plan sponsors in an untenable bind: upon receiving the actuary's critical-status certification, plan sponsors must undertake various affirmative tasks on a tight statutory schedule, within as little as 30 days, or they can be sued for failing to take timely action in response to a critical-status certification.  29 U.S.C. §§ 1085(e)(1); 1132(a)(3), (a)(10). But here, Plaintiffs seek to sue plan sponsors *for taking* timely action in response to the actuary's Critical Status Certification.  Such potential liability does not square with the expedited schedule Congress imposed. *See id.* § 1085 (b)(3)(D), (c)(1), (e)(1).

WEINBERG, ROGER & ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 3:14-cv-5596 (JST)

1    Congress enacted the PPA to help financially ailing plans, not burden them.  And it is

2    highly doubtful that Congress—which established a detailed rehabilitation plan process not easily

3    unwound, *see* § 29 U.S.C. 1085(e)-(f), which entrusted certification to plan actuaries, which

4    chose to make the triggering event the *fact* of the actuary's certification, *see id.* § 1085(b)(2), and

5    which took steps to ensure effective agency oversight of certifications, *see* § *id.* 1085(b)(3)(A),

6    (D)—would have also intended to allow participants to so easily challenge funding certifications

7    that would risk undoing this delicate balance.  From review of the legislative history and

8    attendant statutory commentary, we are aware of no authority to support plan liability for

9    improper actuarial funding certifications, let alone the strict liability Count II proposes.[10]

10                **C.  Defendants are Entitled to Judgment on Count III**

11    Count III is in all material respects identical to Count II, but seeks relief against the Fund

12    trustees *as fiduciaries* for "certifying that the Fund was in critical status when in actuality it was

13    not."  FAC ¶ 77.  The only substantive allegations to distinguish Count III from Count II is that

14    Plaintiffs appear to suggest a motive by alleging that the trustees knew at the time of the Critical

15    Status Certification that the 2010 amendment might be held invalid, *id.* ¶ 73, and therefore

16    adopted a Rehabilitation Plan containing an amendment identical to the July 2010 amendment in

17    all respects but the effective date, saving the Fund millions of dollars, *id.* ¶¶ 74-76.

18    This claim fails for multiple reasons. First, a necessary premise of the claim is Paragraph

19    77's assertion that the Fund was not "in actuality" in critical status.  But, as we explained, that

20    allegation is "merely conclusory."  *Gilead*, 536 F.3d at 1055.  And the remaining allegations in

21    Count III add nothing in the way of "non-conclusory factual content" to support the plausibility of

22    the allegation that the actuary's 2012 critical-status certification was erroneous.  *Moss*, 572 F.3d

23    at 969. The viability of Count III thus turns entirely on the allegations in Count II, which, as we

24    already explained, state no plausible claim.  *See supra* at 13-21.

25    Second, a necessary premise of the claim is that the *Trustees* performed the certification.

26    _____

27    [10]  Based on Defendants' research, the instant lawsuit is the only case under this nine year old
      statute in which a plaintiff has even sought to unwind any portion of a rehabilitation plan by
28    arguing that the certification triggering the process was flawed in some respect.

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

1   FAC ¶ 77.  As explained *supra* at 17-19, it is the Fund's actuary—not the Fund's Trustees—

2   which is assigned the statutory duty to certify critical status.  *See* 29 U.S.C. § 1085(b); *supra* at

3   17-19; *see also* Beck Decl., Ex. A (2012 Certification).  And the Amended Complaint contains no

4   nonconclusory allegation from which the Court could infer that the trustees, contrary to the PPA,

5   were responsible for the certification.  Even if there were such an allegation, the 2012

6   Certification would prove it false because that incorporated document makes clear that *Segal*

7   performed the actuarial certification. Beck Decl. Ex. A at 4; *see also Gonzalez*, 759 F.3d at 1115.

8           Finally, no breach of ERISA fiduciary duty can lie under the allegations of Count III for

9   the simple reason that the trustees do not act as ERISA fiduciaries in connection with the

10  certification process.  Rather, in connection with funding certifications the Board of Trustees'

11  members act as *plan sponsor*, and *not* under the strict standard of care reserved for fiduciary acts.

12  *Compare* 29 U.S.C. § 1085(b)(3)(B)(iii) *with* 29 U.S.C. § 1104; *see also* 29 U.S.C. §

13  1002(16)(B)(iii) (in the case of a multiemployer plan like the Fund, the "joint board of trustees" is

14  the plan sponsor).  Thus, Count III would fail in any event because fiduciary breach claims do not

15  lie against defendants acting as plan sponsors.  *See Lockheed Corp. v. Spink*, 517 U.S. 882, 890

16  (1996); *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004) (fiduciary

17  breach may not be asserted against person not acting in fiduciary capacity).[11]

18              **D.      Defendants are Entitled to Judgment on Count IV**

19          Count IV also asserts a breach of fiduciary duty, this time in connection with the Trustees'

20  Golden 80/Golden 90 plan amendments implementing the 2012 Rehabilitation Plan. The

21  gravamen of the claim is that by amending the Golden 80 and 90 eligibility rules in a way that

22  impacts actively employed participants differently from those participants no longer in covered

23  employment, Defendants "favor[ed] one group of participants over another," breaching their §

24  404(a) fiduciary duty "to act solely in the interest of Fund participants and beneficiaries," and

25  _____

26  [11]  The express language of the PPA treating these functions as plan sponsor activities is
    consistent with ERISA authority, which recognizes actuarial tasks as generally non-fiduciary.

27  *See Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 537 (7th Cir. 1991) (actuaries are generally
    not ERISA fiduciaries and do not "become fiduciaries . . . when they do no more than perform the

28  tasks the statute assigns to them").

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

those amendments "were not adopted pursuant to Plan § 8.19(a)."  FAC ¶¶ 82-85. Like the earlier

counts, this claim fails for multiple reasons.

a.      First, Count IV, like Count III, starts from the assumption that adoption of the

Rehabilitation Plan and the resulting Golden 80/Golden 90 amendments were ERISA fiduciary

duties.  *See* FAC ¶ 81.  Courts reviewing such claims, however, reach the opposite conclusion.

*See Spink*, 517 U.S. at 890 ("Plan sponsors who alter the terms of a plan do not fall into the

category of fiduciaries."); *Wright*, 360 F.3d at 1101-02 (same). That would be the end of the

matter ordinarily.  But Count IV invokes Section 8.19 of the Plan Rules, which, *inter alia*, states

that "[i]n making any decision to amend the Plan, the Trustees shall act as fiduciaries within the

meaning of section 3(21) of ERISA." Plan Rules § 8.19; *see also* FAC ¶ 82.

While Plan Rule § 8.19 may require the trustees to act with fiduciary care in amending the

Fund's plan as a matter of *plan* compliance, it does not convert the plan sponsor function to a

fiduciary function as an ERISA *statutory* matter.  And here, the Amended Complaint expressly

disclaims that the Trustees violated Section 8.19, or any other plan term, stating that "the claims

alleged and the reliefs sought herein arise from *statutory* violations *as opposed to violations of*

*terms of the Fund*, such that the plaintiffs and . . . class are not required to exhaust any

administrative remedies . . . ." FAC ¶ 57 (emphasis added).  Plaintiffs cannot have it both ways:

either they (1) assert a fiduciary breach based on statutory violation of the PPA, in which case

they may not be required to exhaust the Fund's administrative remedies, but the claim fails

because the allegedly improper amendment is not subject to ERISA fiduciary standards; or (2)

Plaintiffs assert a claim based on breach of Defendants' duties under the *plan*, which fails because

Plaintiffs have failed to invoke—much less exhaust—the Fund's administrative remedies

regarding this claim.  *See Graphic Commc'ns Union, Dist. Council No. 2 v. GCIU-Employer Ret.*

*Ben. Plan*, 917 F.2d 1184, 1187 (9th Cir. 1990) ("[E]xhaustion . . . is ordinarily required where an

action seeks 'a declaration of the parties' rights and duties *under the pension plan*.'") (emphasis

in original) (quotation omitted); *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp.,*

*Inc.*, No. CV-14-02139, 2015 WL 1608991, at *63 (C.D. Cal. Apr. 10, 2015) ("There is . . . a

distinction between claims for relief that only allege violations of the terms of ERISA statutes

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

23

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 3:14-cv-5596 (JST)

1   (which do not require exhaustion), and claims for relief that *necessitate [an] inquiry* into the

2   parties' rights and duties under a plan (which do).") (emphasis added); *see also Diaz v. United*

3   *Agr. Emp. Welfare Benefit Plan & Trust*, 50 F.3d 1478, 1483-84 (9th Cir. 1995).[12]

4           b.      Moreover, on its own terms Count IV does not allege facts sufficient to make out a

5   breach of fiduciary duty.  Count IV alleges that the Trustees, by amending the Golden 80/Golden

6   90 eligibility requirements, made an unfair distinction between participants in covered

7   employment (for whom employer contributions are being made) and participants no longer in

8   covered employment (for whom no employer contributions are made).  FAC ¶¶ 84-85.  But PPA

9   § 305 expressly authorizes the very distinction Plaintiffs claim is unlawful: with respect to

10  participants for "whom contributions are not currently required to be made" (*i.e.*, those no longer

11  in covered employment), it provides that the plan sponsor designing a rehabilitation plan is to

12  have "flexibility" to "reduce their adjustable benefits to the extent permitted under this title and

13  considered appropriate by the plan sponsor based on the plan's then current overall funding

14  status." 29 U.S.C. § 1085(e)(8)(A)(iii); *see also* Joint Agency Report at 46 (noting the statutory

15  license to treat active and inactive participants differently).  If Plaintiffs think this distinction is

16  unfair or unreasonable (though it is not, *see infra* at note 13), their complaint is with Congress,

17  not with the Trustees.  And even if Plaintiffs' general understanding of fiduciary duties under

18  ERISA § 404(a) were correct (though it is not, *see infra* at 24-25), the clear and specific

19  authorization in § 305(e)(8) to treat inactive and active participants differently would control.  *See*

20  *generally Cal. ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. United States*, 215 F.3d

21  1005, 1013 (9th Cir. 2000) ("[A] general statutory provision may not be used to nullify or to

22  trump a specific provision.").

23          In any event, ERISA § 404(a)'s direction that fiduciaries act "solely in the interest of the

24  participants" does not, as Count IV alleges, require that all participants, even those differently

25  situated, must be treated identically; rather, the provision, as it sounds, forbids a fiduciary to act

---

[12] Plaintiffs have not alleged that they exhausted their administrative remedies, *see* FAC ¶¶ 56-57, nor could they so allege, *see* Decl. of Elizabeth Briere Regarding Class Certification [dkt. #70-1] ¶¶ 3-4.  And Plaintiffs' contention that exhaustion would be "futil[e]", FAC ¶56, is entirely conclusory.

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

in the interest of *nonparticipants*.  *See* 29 U.S.C. § 1104(a).  And, to the extent ERISA fiduciaries adopt rules to administer a plan in a manner that distinguishes between participants, those rules are consistent with ERISA duties unless arbitrary or unreasonable.  *See generally Elser v. IAM Nat'l Pension Fund*, 684 F.2d 648, 654, 655-56 (9th Cir. 1982) (courts afford trustees "broad discretion in setting eligibility rules" and intervene only in "those cases where the eligibility requirements are so patently arbitrary and unreasonable as to lack foundation") (quotations omitted); *Harm v. Bay Area Pipe Trades Pension Plan Trust Fund*, 701 F.2d 1301, 1305-06 (9th Cir. 1983) (benefit provisions that excluded credits for retirees returning to covered employment were reasonably in interest of plan's financial health, and stated no breach of fiduciary duty against board of trustees).  Here, Plaintiffs have alleged no facts from which the Court could plausibly determine that the change in the Golden 80/Golden 90 pension eligibility requirements expressly contemplated by the PPA, *see supra* at 24, was arbitrary or that the amendment had no "rational connection between the rule and the fund's purposes."  *Harm*, 701 F.2d at 1305.[13]

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint and enter judgment in favor of all Defendants.

---

[13]   In fact, to the contrary, the trustees had good reasons to craft the eligibility rules as they did. For starters, because employer contribution levels are required to increase under any rehabilitation plan, *see* 29 U.S.C. § 1085(e)(7), and because some or all of these increased contributions will be borne by the active employees in the form of salary concessions, it could be inequitable if benefit reductions in a rehabilitation plan *were* identical for inactive and active participants. *See* GAO Report at 36 (describing "the sacrifices already made by active participants—some of whom are absorbing the cost of significant contributions to support benefit payments at a level they will likely never see for themselves"). In addition, maintaining a strong base of active participants is important to a plan's long-term financial viability.  *See* 29 U.S.C. § 1085(b)(2)(C)(ii); *see also* GAO Report at 26 & n.35; Joint Agency Report at 14. It is thus rational and reasonable to minimize benefit reductions on active participants as incentive to "bargain for continued contributions to the plan."  Joint Agency Report at 49 & n.99.

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

1

2

3

4                                                    BREDHOFF & KAISER, P.L.L.C.
                                                     WEINBERG, ROGER & ROSENFELD, P.C.

5                                                          */s/ Robert Alexander*
                                            By:    Robert Alexander (*admitted pro hac vice*)
6                                                  Julia Penny Clark (*admitted pro hac vice*)
                                                   Concepción E. Lozano-Batista
7                                                  Emily P. Rich

8                                                  Attorneys for Defendants

9
Dated: September 24, 2015
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

26