GEOFFREY V. WHITE (SBN. 068012)
LAW OFFICE OF GEOFFREY V. WHITE
21-C Orinda Way #324
Orinda, California 94563
Telephone: (415) 373-8279
Facsimile: (415) 484-7692
Email: gvwhite@sprynet.com

THOMAS O. SINCLAIR (*Adm. pro hac vice*)
M. CLAYBORN WILLIAMS (*Adm. pro hac vice*)
SINCLAIRWILLIAMS LLC
2100A Southbridge Pkwy, Suite 336
Birmingham, Alabama 35209
Telephone: 205.868.0818
Facsimile: 205.868.0894
Email: tos@sinclairwilliams.com
        mcw@sinclairwilliams.com

CLASS COUNSEL

WILLIAM D. FRUMKIN (*Adm. pro hac vice*)
ELIZABETH E. HUNTER (*Adm. pro hac vice*)
FRUMKIN & HUNTER LLP
1025 Westchester Avenue, Suite 309
White Plains, NY 10604
Telephone: (914) 468-6096
Facsimile: (914) 468-6099
Email: wfrumkin@frumkinhunter.com
        ehunter@frumkinhunter.com

JUDITH L. SPANIER (*Adm. pro hac vice*)
NANCY KABOOLIAN (*pro hac vice to be filed*)
ABBEY SPANIER LLP
212 Ease 39th Street
New York, NY 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191
Email: jspanier@abbeyspanier.com
        nkaboolian@abbeyspanier.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JUAN M. REYES, SALVATORE TAGLIARENI, ANGEL DE LA CRUZ, ANTONIO MEROLLA, SMAIL MUSOVIC, TESFAYE GHEBREMEDHIN, PHILIP ROGERS, ALMOND REID, CARMELO CALABRO, RUSSELL NEUBERT, and JOHN WILLIAMS**, individually and as representatives on behalf of a class of similarly situated persons, <br><br> Plaintiffs, <br><br> v. <br><br> **BAKERY AND CONFECTIONERY UNION AND INDUSTRY INTERNATIONAL PENSION FUND; and STEVEN BERTELLI, DAVID B. DURKEE, JETHRO A. HEAD, ART MONTMINY, ROBERT OAKLEY, JAMES RIVERS, RANDY D. ROARK, BARBARA BRASIER, TRAVIS CLEMENS, JON MCPHERSON, LOU MINELLA, DOUG RUYGROK, and JOHN WAGNER**, in their official capacities as Trustees, <br><br> Defendants. | Case No. 3:14-cv-5596-JST <br><br><br> **OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (Doc. 73)** <br><br> **Date:** December 10, 2015 <br> **Time:** 2:00 p.m. <br> **Judge:** Hon. Jon S. Tigar <br> **Courtroom:** 9, 19th Floor |

# TABLE OF CONTENTS

STATEMENT OF RELEVANT FACTS ................................................................................1

STANDARD OF REVIEW ................................................................................................4

ARGUMENT ................................................................................................................4

I.   THE CONTINGENT AMENDMENT'S DEFECTS. ................................................4

   A.  Notice of the Contingent Amendment Was Not Properly Given. ................................4

   B.  The Fund Failed to Meet the Requirements of the PPA and thus the Amendment
       in Question Violates ERISA's Anti-Cutback Statute. ...............................................6

   C.  No Deference is Due to be Afforded on Questions of Statutory Compliance. ..............6

   D.  The Fund's Varying Interpretations of the Contingent Amendment. ..........................7

II.  COUNT II ADEQUATELY ALLEGES THAT DEFENDANTS BREACHED
     THEIR STATUTORY AND FIDUCIARY DUTY WITH REGARD TO THE
     CERTIFICATION OF CRITICAL STATUS. .........................................................9

   A.  Plaintiffs Sufficiently Alleged that The Fund Did Not Meet the Requirements for
       Critical Status Certification. ...............................................................................9

       1.  Plaintiffs' Allegations Are Not Conclusory. ....................................................9

       2.  Plaintiffs' Allegations Regarding the Funding Deficiency Are not Contradicted
           by the Documents and Should be Viewed in Plaintiffs' Favor. ..........................11

   B.  Plaintiffs' Claim Regarding the Critical Status Certification Is Permitted by the
       Statutory Scheme. ............................................................................................12

       1.  Defendants Have a Statutory Duty to Provide Information to the Actuary and
           Can Be Sued for Breach of that Duty. ...........................................................13

       2.  The Statutory Scheme Provides for Defendants' Liability for Overseeing the
           Actuary and for Plaintiffs to Challenge the Certification of Critical Status. .........14

           a.  Defendants Cannot Hide Behind the Actions of Their Actuary and Absolve
               Themselves of Fiduciary Duties. .............................................................14

           b.  Defendants Incorrectly Argue that the Plan Sponsor's Duties are Contingent
               Upon and Mandated by the Actuary's Certification. ....................................17

           c.  Defendants Imply that the Short Timeframes for Plan Action Leave No
               Time for Questioning the Certification of Critical Status................................18

           d.  Administrative Oversight is Inadequate and Does Not Replace a Legal
               Cause of Action…................................................................................19

       3.  Defendants Are Not Entitled to a Deferential Standard of Review. .....................20

III. COUNT III ADEQUATELY ALLEGES A BREACH OF FIDUCIARY DUTY BY DEFENDANTS RELATED TO THE CERTIFICATION OF CRITICAL STATUS. ......21

IV. COUNT IV ADEQUATELY ALLEGES THAT DEFENDANTS BREACHED THEIR DUTY TO ACT IN THE INTERESTS OF ALL PARTICIPANTS IN ENACTING THE REHABILITATION PLAN. ..................................................................22

    A. The Trustees Acted as Fiduciaries in Amending the Plan Because the Plan Language Designated Amendment as a Fiduciary Act.................................................22

CONCLUSION.........................................................................................................................25

## <u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Alcantara v. Bakery and Confectionery Union and Industry Intern. Pension Fund Pension Plan*, 751 F.3d 71 (2nd Cir. 2014) .................................................. 3, 6, 8, 20

*Arendt v. Harris*, 539 Fed. Appx. 813 (9th Cir. 2013) .................................................. 12

*Batchelor v. Oak Hill Medical Group*, 870 F.2d 1446 (9th Cir. 1989) ....................................... 16

*Chisom v. Roemer*, 501 U.S. 380 (U.S. 1991) ................................................................. 15

*Concha v. London*, 62 F.3d 1493 (9th Cir. Cal. 1995) ........................................................ 21

*Finley v. United States,* 490 U.S. 545 (U.S. 1989) ........................................................... 15

*Graphic Communications Union, Dist. Council No. 2 v. GCIU-Employer Retirement Ben. Plan*, 917 F.2d 1184 (9th Cir. Cal. 1990) ...................................................... 23

*Hamilton v. Wash. State Plumbing & Pipefitting Indus. Pension Plan,* 433 F.3d 1091 (9th Cir. 2006)............................................................................................. 13, 15

*Hawthorne v. Umpqua Bank*, 2013 WL 5781608 (N.D. Cal., 2013)............................................. 4

*Howell v. Motorola,* 337 F.Supp.2d 1079 (N.D. Ill. 2004)....................................................... 17

*IBEW Local 241 Pension Plan v. First Allmerica Fin. Life Ins. Co.*, 354 F.Supp.2d 203 (N.D.N.Y. 2005) .......................................................................................... 16

*In re Bakery and Confectionery Union and Industry Intern. Pension Fund Pension Plan*, 865 F.Supp.2d 469 (S.D. N.Y. 2012)...................................................................... 3

*In re Syncor ERISA Litig.*, 351 F.Supp.2d 970 (C.D. Cal. 2004) ................................................ 17

*John Blair Communications, Inc. Profit Sharing Plan et al. V. Telemundo Group, Inc. Profit Sharing Plan*, 26 F.3d 360 (2d Cir. 1994) ....................................................... 24

*Long v. Flying Tiger Line, Inc.*, 994 F.2d 692 (9th Cir. Cal. 1993)............................................. 20

*McGuigan v. Local 295/Local 851 I.B.T. Employer Group Pension Plan, et al.,* 2011 WL 3421318 (E.D.N.Y.)........................................................................................ 5, 7

*Mertens v. Hewitt Assocs.,* 948 F.2d 607 (9th Cir. 1991) ..................................................... 16

*Morse v. Stanley*, 732 F.2d 1139 (2nd Cir. N.Y. 1984) ....................................................... 24

*Nat. Resources Def. Council v. Kempthorne*, 621 F.Supp.2d 954 (E.D. Cal. 2009) ..................... 8

*Owens v. Auto. Machinists Pension Trust*, 551 F.3d 1138 (9th Cir. Wash. 2009) ...................... 15

*Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982 (9th Cir. 1997)................. 8

*Royal Oak Enterprises LLC v. Pension Benefit Guarantee Corporation,* 78 F.Supp.3d 431
   (D.D.C. 2015) ............................................................................................................. 6

*Schleben v. Carpenters Pension Trust Fund,* 2014 U.S. Dist. LEXIS 128544
   (E.D. Mich. Sept. 15, 2014) ....................................................................................... 19

*Schwarz v. UFCW – Northern California Employers' Joint Pension Plan*, 2014 WL 186647
   (N.D. Cal.) .................................................................................................................... 5

*Scott, et al. v. Bakery and Confectionery Union and Industry International Pension
Fund, et al.,* S.D.N.Y., 7:12-cv-00142-VB ................................................................. 5

*Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587 (9th Cir. 1984) ............................... 12

*Yeseta v. Baima*, 837 F.2d 380 (9th Cir. 1988) .............................................................. 16

**Statutes**

ERISA § 204 ..................................................................................................................... 6

ERISA § 305 .............................................................................................................. *passim*

ERISA § 404 .................................................................................................. 6, 21, 22, 25

ERISA § 502 .............................................................................................................. *passim*

29 U.S.C. § 1002 .............................................................................................................. 1

29 U.S.C. § 1084 ....................................................................................................... 10, 11

29 U.S.C. § 1085 ...................................................................................................... *passim*

29 U.S.C. § 1104 ....................................................................................................... 21, 22

29 U.S.C. § 1132 ................................................................................................ 18, 21, 22

29 U.S.C. § 1301 .............................................................................................................. 1

**Other Authorities**

DOL Info. Ltr, Wash. Serv. Bureau No. DLO591, 1998 ERISA LEXIS 11 (July 28, 1998) ...... 16

**Regulations**

29 C.F.R. 2509 ............................................................................................................... 16

1

## STATEMENT OF RELEVANT FACTS

The Bakery and Confectionery Union and Industry International Pension Fund ("Fund") is a multiemployer defined benefit plan pursuant to 29 U.S.C. § 1002(35) and 29 U.S.C. § 1301 (a)(3) that is intended to provide pension benefits to participants who work for employers that contribute to the Fund on behalf of participants for each hour participants worked.  Doc. 44, First Amended Complaint (hereinafter "Amended Compl.") at ¶ 25.  These participants then accumulate credited service under the Fund based on their years of covered employment.  *Id.*

The Fund's governing documents include a variety of retirement pensions available to plan participants and their spouses or families.  One such plan is the "Age and Service = 80 Pension," identified in the Fund Documents as "Plan G."  Id. at ¶ 29.  The Summary Plan Description ("SPD") (Doc. 1-1, 1-2) describes Plan G, also sometimes referred to as the "Golden 80 Plan," as follows, in relevant part:

> **Plan G** was established to provide a full benefit when the participant's age (in years and months) and his or her service (in years and months) total 80.
>
> The Benefit formula is simple.  When your age (in years and months) and your service (in years and months) equal 80 you are entitled to retire at the present full benefit level shown on your shop chart, plus, if you are eligible, the full amount of the **Plan A** Supplemental Benefit to which that amount entitles you.  If you commenced participation in the Pension Fund on or after December 3, 1998, you must also have a minimum of 10 years of service to be eligible for this Pension.

Doc. 44, Amended Compl. at ¶ 29 (quoting Doc. 1-1, SPD at p. 9).  Under these documents, after a plan participant accrues the right to participate in Plan G benefits that plan participant may begin receiving benefits when his or her age and number of years of service yield a sum equal to or greater than 80.  Id.

Another plan is the "Age and Service = 90 Pension," identified in the Fund Documents as "Plan C."  Doc. 44, Amended Compl. at ¶ 29.  The SPD (Doc. 1-1, 1-2) describes Plan C, also sometimes referred to as the "Golden 90 Plan," as follows, in relevant part:

**Plan C** was established to give a higher benefit to those who have worked many years in the industry but have not yet become 65 years of age.

The Benefit formula is simple.  When your age (in years and months) and your service (in years and months) equal 90 you are entitled to retire at the present full benefit level shown on your shop chart, plus, if you are eligible, the full amount of the **Plan A** Supplemental Benefit to which that amount entitles you.  If you commenced participation in the Pension Fund on or after December 3, 1998, you must also have a minimum of 10 years of service to be eligible for this Pension.

Doc 44, Amended Compl. at ¶ 29 (quoting Doc. 1-1, SPD at p. 9).  Plan C operates in materially the same way as Plan G.  Under Plan C, after a Plan Participant accrues the right to participate in this particular benefit, that Plan Participant may begin receiving benefits when his or her age and number of years of service yield a sum equal to or greater than 90.

Sometime before July 1, 2010, the Fund amended the governing documents with respect to benefits provided under Plan G and Plan C with said amendment having an effective date of July 1, 2010 (the "2010 Amendment").  Doc. 44, Amended Compl. at ¶ 33; Doc. 21, February 26, 2015 Declaration of John Beck [Fund Executive Director] (hereinafter "Beck Feb. 2015 Dec.") at ¶ 18.  According to the 2010 Amendment, Participants who had since retired and were no longer "working in covered employment" were to continue receiving their Plan G or Plan C benefits if their pension payments had already commenced by the Amendment's effective date of July 1, 2010.  Amended Compl. at ¶ 33; Doc. 21, Beck Feb. 2015 Dec. at ¶ 19.  As a result, under the 2010 Amendment, Participants who were no longer working in "covered employment" could not "age into" Plan G or Plan C benefits.  Id.

Several Participants filed suit over the 2010 Amendment and after consolidation of those lawsuits before the U.S. District Court of the Southern District of New York, the Participants filed their motions for judgment on the pleadings and the Fund filed its cross motion for judgment.  Amended Compl. at ¶¶ 35 and 37.  Briefing on the parties' respective cross motions was concluded on April 20, 2012.  *Id.*

On April 27, 2012 the Fund mailed out its "Annual Funding Notice" reporting its actuaries had determined the Fund was in "critical status" as that term is defined within the Pension Protection Act of 2006 ("PPA").  With that same mailing, the Fund sent out a "Notice of Critical Status" warning of potential future amendments "that might reduce or eliminate adjustable benefits."  Doc. 47, Defendants' Answer to Amended Compl. at ¶ 37; Doc. 21, Beck Feb. 2015 Dec. at ¶ 26; Doc. 21-1, Actuarial Certification dated March 30, 2012; Doc. 21-2, "Critical Status Notice."

On June 6, 2012, Judge Briccetti of the Southern District of New York ruled the 2010 Amendment "violated the anti-cutback rule insofar as it eliminated an accrued benefit under ERISA for those employees who had reached ten years of service."  *In re Bakery and Confectionery Union and Industry Intern. Pension Fund Pension Plan*, 865 F.Supp.2d 469, 475 (S.D. N.Y. 2012).

"Also in 2012, a special committee of four trustees was delegated responsibility for developing the Rehabilitation Plan."  Doc. 21, Beck Feb. 2015 Dec. at ¶ 27.  "On November 7, 2012, the [Fund] adopted the Rehabilitation Plan" in a meeting of the "full Board of Trustees."  *Id.*  Included within that Rehabilitation Plan is the "Contingent Amendment" as described within the Amended Complaint.  On November 14, 2012, the Fund mailed Participants notice of the Contingent Amendment regarding the Golden 80/Golden 90 benefits.  Doc. 73, Defendants' Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c); and Memorandum of Points and Authorities in Support Thereof (hereinafter "Defs. Motion") at p. 7.  The Fund now claims that Contingent Amendment has an effective date of April 30, 2012, three days after the Notice of Critical Status was mailed on April 27, 2012.

On May 1, 2014 the ruling of the United States District Court, Southern District of New York, was affirmed by the Second Circuit Court of Appeals. *Alcantara v. Bakery and*

1   *Confectionery Union and Industry Intern. Pension Fund Pension Plan*, 751 F.3d 71 (2nd Cir.

2   2014).

3   ### STANDARD OF REVIEW

4
5       After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). Analysis under Rule

6   12(c) motions for judgment on the pleadings is "substantially identical to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether

7   the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Chavez v. United States,* 683 F.3d 1102, 1108 (9th Cir.2012) (quotation

8   omitted). However, "if the pleadings do not resolve all of the factual issues in the case, a trial on the merits would be more appropriate." Wright & Miller, 5C Fed.

9   Prac. & Proc. Civ. § 1367 (3d ed., rev.2013).

10  On a motion to dismiss, courts accept the material facts alleged in the complaint, together with all reasonable inferences to be drawn from those facts, as true.

11  *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare

12  recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

13
14  To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550

15  U.S. 544, 570 (2007). Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at

16  687.

17
18  *Hawthorne v. Umpqua Bank*, 2013 WL 5781608, at *4 (N.D. Cal., 2013).

19  ### ARGUMENT

20  ## I.   THE CONTINGENT AMENDMENT'S DEFECTS.

21      On April 27, 2012, the Fund mailed its "Notice of Critical Status" to Plan participants

22  declaring the amendments not yet enacted by the Fund would have an effective date of April 30,

23  2012.  Then, in November 2012 following a special meeting of the Board, the Fund adopted the

24  Contingent Amendment as it was described within the Rehabilitation Plan.

25
26  ### A.  Notice of the Contingent Amendment Was Not Properly Given.

27      The Fund admits within its motion that the PPA requires the Fund to provide "notice of

28  adjustable benefit reductions **before** implementing them" (Doc. 73, Defs. Motion at p.

16)(emphasis added).  However, the Fund fails to mention that the PPA requires the Fund to give participants a minimum of 30 days' notice *before* the amendment's effective date.  *Schwarz v. UFCW – Northern California Employers' Joint Pension Plan*, 2014 WL 186647 at *9 (N.D. Cal.) ("A notice of any reduction of adjustable benefits [under the PPA] must be provided at least thirty days before the general effective date of the reduction for all participants and beneficiaries.")(quoting 29 U.S.C. § 1085(e)(8)(C)(i)); *McGuigan v. Local 295/Local 851 I.B.T. Employer Group Pension Plan, et al.,* 2011 WL 3421318 at *5 (E.D.N.Y.) ("There is an additional notice requirement applicable to reductions to a plan's adjustable benefits.  ERISA provides:  No reduction may be made to adjustable benefits … unless notice of such reduction has been given at least thirty days before the general effective date of such reduction …")(citing 29 U.S.C. § 1085(e)(8)(C)(i)-(ii)).

The purpose of this Notice is to insure the protection of the participants' interests and reasonable expectations.  Under 29 U.S.C. § 1085(e)(8)(C(i-ii), the notice must provide information sufficient to enable participants and beneficiaries to understand the effect of any reduction on their benefits.  This is so participants may prepare themselves for that reduction and take appropriate steps to protect themselves if such were available.  So, on its face, the Amendment in question violates ERISA's anti-cutback provision[1] and the Fund cannot insulate itself from that violation by using the PPA because the Fund did not comply with the PPA's 30-day notice requirement.[2]

---

[1] The Amendment in question declares itself to be "identical to the amendment that was adopted effective July 1, 2010" and as such is a violation of ERISA's anti-cutback provisions pursuant to the rulings on that 2010 Amendment.  *Scott, et al. v. Bakery and Confectionery Union and Industry International Pension Fund, et al.,* S.D.N.Y., 7:12-cv-00142-VB.

[2] The Fund claims that the "Amended Complaint asserts no PPA violation based on any alleged inadequacy of the Critical Status Notice."  Doc. 73, Defs. Motion at p. 8, fn. 5.  But the Amended Complaint clearly states:  "The Contingent Amendment illegally reduces or eliminates Golden 80 and Golden 90 benefits without the Fund having first provided proper notice to participants prior to an actual reduction of benefits . . ."  Amended Compl. at p. 3.

**B.  The Fund Failed to Meet the Requirements of the PPA and thus the Amendment in Question Violates ERISA's Anti-Cutback Statute.**

The Fund inaccurately describes the burdens on the parties (particularly at this stage of the pleadings) regarding the applicability of the PPA *exception* to ERISA's anti-cutback rule. "Recognizing that some sections of the PPA might require plan amendments that would otherwise violate the anti-cutback provisions, Congress explicitly provided relief from ERISA § 204(g) [ERISA's anti-cutback provision] …, and offered plan administrators a grace period to take advantage of that relief." *Royal Oak Enterprises LLC v. Pension Benefit Guarantee Corporation,* 78 F.Supp.3d 431, 436 (D.D.C. 2015)(citing PPA § 1107).

The 2010 Amendment was determined to be a violation of ERISA's anti-cutback prohibition (29 U.S.C. § 204(g)).  *Alcantara,* 751 F.3d 71(2nd Cir. 2014).  The Fund specifically identified the Contingent Amendment as identical to the 2010 Amendment.  Doc. 1-5, Rehabilitation Plan at p. 8.  Thus, it is the Fund's burden to establish that the Fund has met the requirement for the exception to § 204(g) granted under PPA § 1107.  Within the Amended Complaint, the Class Members have specifically set out that the Fund failed to meet those PPA requirements.  Doc. 44, Amended Compl. at ¶ 60 ("Adjustable benefits likewise cannot be reduced for participants who have not received timely notice of *actual* reduction of benefits under ERISA § 305(e)(8)(C)").

Rather than establishing an entitlement to judgment on the pleadings, the Fund's Motion only highlights that judgment is due to be granted to the Class.  The Fund did not meet the PPA requirements and thus the Contingent Amendment violates ERISA's anti-cutback rule, 29 U.S.C. § 204(g).

**C.  No Deference is Due to be Afforded on Questions of Statutory Compliance.**

The Fund compounds this burden-shifting error with an argument that this Court is required to "afford broad deference [to the Fund's decisionmaking] and not second guess [the

Fund's] good faith discretionary judgments."  Doc. 73, Defs. Motion at p. 20.  But this preliminary question of whether the Fund met the PPA's requirements (along with other statutory interpretation questions) are questions for the Court's determination without deference to the Fund's decision.  *McGuigan*, 2011 WL at *7 ("The question of whether the [PPA] Notice complied with ERISA is simply one of statutory interpretation and requires giving the plan administrators no deference.")(citing *Wilkens v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 581 (2nd Cir. 2006)).  *See also* Defendants' Answer at p. 5 ("Defendants admit that Plaintiffs' challenge to the amendment to the Rules and Regulations of the Fund effective April 30, 2012 under ERISA and the PPA presents a question of law that is common to all plan participants whose eligibility to receive Plan G or Plan C benefits was or might be affected by that amendment.")(emphasis added).

On its face, the Contingent Amendment has an effective date that is only three (3) days from the mailing date of the Critical Status Notice to Class Members.  The question of whether the Fund met the PPA requirements is one for the Court to decide – and the answer seems obvious.  But, that was not the only defect with the Contingent Amendment.

**D.  The Fund's Varying Interpretations of the Contingent Amendment.**

The Fund has offered inconsistent and at times conflicting interpretations of the Contingent Amendment.  The Contingent Amendment adopted on November 7, 2012 contains language declaring itself to be a "contingent measure because of the pending court challenge to the earlier [2010] amendment:"

> **iv.  Becoming Eligible for Golden 80 and Golden 90 Pensions.**
> Participants who has not yet reached the combination of age and service required to be eligible for a Golden 80 or Golden 90 pension as of April 30, 2012, will not be permitted to age into the Golden 80 or Golden 90 benefit after leaving covered employment.  (Except for the effective date, this amendment will be identical to the amendment that was adopted effective July 1, 2010.  This amendment is adopted as a contingent measure because of the pending court challenge to the earlier amendment.)

Doc. 1-5, Rehabilitation Plan at p. 8.

Taking the Fund's present position and interpretation (as it is contained within fn. 6 at p. 10 of the Fund's Motion), the Fund would have the Court believe that the "Contingent Amendment" was in force from April 30, 2012 forward.  But, this interpretation flies in the face of the Fund's own pension statements mailed to Golden 80/90 participants such as Mr. Reyes in the 2013 calendar year which make <u>no</u> mention of the Contingent Amendment affecting the participants' rights.  *See, e.g.,* Doc. 44, Amended Compl. at 52 ("For example, in keeping with the foregoing, in 2012 and 2013 statements, Defendants informed Plaintiff Juan Reyes that his Golden 80 Plan benefit was eliminated and/or reduced <u>subject to the 2010 Amendment</u>.  It was only after the 'Contingency' occurred (the Second Circuit affirmed it was an illegality of the 2010 Amendment) that Mr. Reyes and other Class Members were informed, in light of the judgment in the New York Action, their Golden 80/90 benefits were now denied as a result of the Contingent Amendment included in the November 7, 2012 Rehabilitation Plan.").[3]

An additional problem with the Fund's position is that it would require this Court to ignore the word "contingent" the Fund itself used within the amendment as it was set forth in the Rehabilitation Plan which the Fund adopted.  Federal common law principles of contract interpretation guide the interpretation of an ERISA retirement plan.  *Richardson v. Pension Plan of Bethlehem Steel Corp.,* 112 F.3d 982 (9th Cir. 1997).  The terms of the plan should be interpreted in an ordinary and common manner as would a person of average intelligence and experience.  *Id.*  "An interpretation which gives a reasonable, lawful and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful *or of no effect*."  *Nat. Resources Def. Council v. Kempthorne*, 621 F.Supp.2d 954, 983 (E.D. Cal.

---

[3] In the *Alcantara* action, at no point did the Fund argue that the 2010 Amendment had been withdrawn.  To the contrary, the Fund stood fully behind it in its entirety, such that if the Amendment had been upheld, the PPA Amendment was not effective – and not needed.

2009)(emphasis in original)(citing Restatement (Second) of Contracts § 203 (1981)). So initially and from the outset of the Contingent Amendment, the Fund's interpretation was to give effect to the word "contingent" but then when the Fund lost the New York Action, the Fund's new interpretation was to ignore the word contingent.

At the heart of the Fund's request for judgment is the assumption that the Court will ignore the Fund's failure to comply with the PPA, accept the Fund's most recent interpretation and not question the findings of the Fund actuaries and consultants in claiming the Fund had reached "critical status" as that term is defined within the PPA. Adoption of the Fund's arguments would effectively insulate every pension fund's PPA declaration from any sort of legal challenge. In this case, however, the Fund did not meet the PPA requirements and thus the Fund, yet again, has violated ERISA's anti-cutback statute. The Fund's actuarial arguments as to the remaining counts do not cure that defect.

## II. COUNT II ADEQUATELY ALLEGES THAT DEFENDANTS BREACHED THEIR STATUTORY AND FIDUCIARY DUTY WITH REGARD TO THE CERTIFICATION OF CRITICAL STATUS.

Count II of Plaintiffs' Amended Complaint alleges that the Fund's certification of critical status violated the PPA and ERISA because it failed to meet the criteria set forth in 29 U.S.C. § 1085(b). Defendants argue they should be granted judgment as to Count II for two reasons: (A) the allegations regarding how the Fund did not meet the criteria for critical status are conclusory and inaccurate; and (B) the statutory scheme does not provide for a claim against Defendants for the certification of critical status. Defendants' arguments fail for the reasons discussed below.

### A. Plaintiffs Sufficiently Alleged that The Fund Did Not Meet the Requirements for Critical Status Certification.

#### 1. Plaintiffs' Allegations Are Not Conclusory.

The PPA provides that a plan is in critical status if is meets the requirements of one or more subparagraphs of 29 U.S.C. § 1085(b)(2)(A) – (D). The Fund here claimed that it met the

requirements of 29 U.S.C. § 1085(b)(2)(C), which provides that the plan is in critical status if:

(i) (I) the plan's normal cost for the current plan year, plus interest (determined at the rate used for determining costs under the plan) for the current plan year on the amount of unfunded benefit liabilities under the plan as of the last date of the preceding plan year, exceeds (II) the present value of the reasonably anticipated employer and employee contributions for the current plan year,

(ii) the present value, as of the beginning of the current plan year, of nonforfeitable benefits of inactive participants is greater than the present value of nonforfeitable benefits of active participants, and

(iii) the plan has an accumulated funding deficiency for the current plan year, or is projected to have such a deficiency for any of the 4 succeeding plan years, not taking into account any extension of amortization periods under section 1084 (d) of this title.

The PPA, 29 U.S.C. § 1084(c)(2)(A), provides that "the value of the plan's assets shall be determined on the basis of any reasonable actuarial method of valuation which takes into account fair market value and which is permitted under regulations prescribed by the Secretary of the Treasury." In addition, 29 U.S.C. § 1084(c)(3) provides, "Actuarial assumptions must be reasonable. For purposes of this section, all costs, liabilities, rates of interest, and other factors under the plan shall be determined on the basis of actuarial assumptions and methods:  (A) each of which is reasonable (taking into account the experience of the plan and reasonable expectations), and (B) which, in combination, offer the actuary's best estimate of anticipated experience under the plan."

Contrary to Defendants' assertions, Defs. Motion at pp. 13-14, Plaintiffs cite specific actuarial assumptions regarding the interest rate, mortality and projected hours that are unreasonable.  Amended Compl. at ¶¶ 66-68.  That is, Defendants have assumed a lower interest rate on their investments, a lower mortality rate for its participants and beneficiaries, and a lower number of projected hours for the Fund's currently employed participants than would be reasonable.  *Id.*  As Defendants' exhibits show, Defendants decreased the interest rate assumption a full percentage point from 7.5% to 6.5 %, increased the mortality assumption by

one year (three years for disabled lives), and applied an hours assumption of 2,000 hours per active employee.  Doc. 73-2, Annual Certification of Plan Status at pp. 7-8.  These specific assumptions are unreasonable because they ignore the Fund's historical experience, commonly accepted actuarial practice, and general industry projections in an effort to reach "critical status." These allegations are further supported by the attached Declaration of Claude Poulin.  Exhibit 1.[4]

### 2.   Plaintiffs' Allegations Regarding the Funding Deficiency Are not Contradicted by the Documents and Should be Viewed in Plaintiffs' Favor.

Defendants argue they are entitled to judgment under Count II "because allegations regarding the projected funding deficiency simply misread the actuarial document integral to the claim that is incorporated into the Amended Complaint."  Defs. Motion at p. 13.  Defendants argue that "given that the allegations of this paragraph merely reference and incorporate the Fund's actuarial certification itself (*see* ¶¶ 67-69), and that document directly contradicts the allegations, it is *not* a well pled fact that the Court is required to credit on this motion on the pleadings."  Defs. Motion at p. 15.

As discussed above, one of the three requirements for a plan to be in critical status under 29 U.S.C. § 1085(b)(2)(C) is that "(iii) the plan has an accumulated funding deficiency for the current plan year, or is projected to have such a deficiency for any of the 4 succeeding plan years, not taking into account any extension of amortization periods under section 1084 (d) of this title."  In paragraph 69 of the Amended Complaint, Plaintiffs allege that the Fund did not actually meet the requirements of 29 U.S.C. § 1085(b)(2)(C).  Specifically, Plaintiffs allege that "[t]he Fund's projected accumulated funding deficiency does not occur for five years, or until 2017, which is a longer period of time than set forth in the criteria for establishing critical status in 29 U.S.C. 1085(b)(2)."  Defendants argue that "the March 30, 2012 certification which

---

[4] If, as Defendants suggest, the Court may consider in a Rule 12 motion documents such as the Fund's actuarial reports, then Mr. Poulin's report on the Fund's actuarial assumptions is due to be considered in rebuttal.  Defs. Motion at p. 4, fn. 3.

Count II references (¶ 67) and on which it necessarily relies expressly states that, in 2012, the funding deficiency was projected to occur first in *2016* – not 2017 – which was within the five-year period specified in § 1085(b)(2)."  Defs. Motion at p. 16.

In fact, although it was issued on March 30, 2012, the Actuarial Status Certification is as of January 1, 2012, and it explicitly states that "[t]his certification is based on the January 1, 2011 actuarial valuation, dated June 9, 2011."  Doc. 73-1 at p. 1.  At most, the Funding Standard Account Projection shows a negative credit balance at the <u>end</u> of the 2016 year and the <u>beginning</u> of the 2017 year.  Doc 73-1 at p. 5.  This is more than five years from 2011, which is the start of the period for the projection.  This would mean that the Fund's accumulated funding deficiency would have to occur no later than 2016.  Exhibit 1, Poulin Dec. at ¶15.  Thus, Plaintiffs did sufficiently allege that the Fund's projected funding deficiency does not meet the statutory requirements for critical status.

**B.  Plaintiffs' Claim Regarding the Critical Status Certification Is Permitted by the Statutory Scheme.**

Regardless of Defendants' assertions regarding the purpose of the statute, the PPA is part of ERISA, which "is remedial legislation which should be liberally construed in favor of protecting participants in employee benefits plans."  *Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir. 1984).  It is critical to keep in mind that the PPA provides a limited exception to ERISA's protections against cutting employee benefits.  The Ninth Circuit has explained that ERISA "generally prohibits pension plan amendments that reduce certain accrued pension benefits, including early retirement benefits under the 'anti-cutback' rule.  The PPA, which amended ERISA, contains certain exceptions to this rule.  . . . subject to qualifications set forth within the PPA, a pension plan may cut 'adjustable benefits,' including early retirement benefits otherwise protected by the 'anti-cutback' rule."  *Arendt v. Harris*, 539 Fed. Appx. 813 (9th Cir. 2013) (internal citations omitted).  Because the PPA provides an exception to ERISA's

anti-cutback rule, that exception should be narrowly construed.  *Hamilton v. Wash. State Plumbing & Pipefitting Indus. Pension Plan,* 433 F.3d 1091 (9th Cir. 2006).

The Defendants' arguments that the statutory scheme does not provide for Plaintiffs' challenge to the Fund's certification of critical status is contrary to ERISA's purpose of "protecting participants in employee benefits plans."  The effect of such a ruling would be to insulate pensions from judicial review of defective, manipulated, or fraudulent critical status certifications being used to justify denial of retirement benefits.  As discussed in further detail below, Defendants' violation of the PPA and ERISA itself arises from two breaches:  (1) the breach of their own independent, statutory duty to provide industry projection information to the actuary, and (2) the breach of their fiduciary duty to oversee the actuary's work.

### 1. Defendants Have a Statutory Duty to Provide Information to the Actuary and Can Be Sued for Breach of that Duty.

Defendants admit that "Congress *did* prescribe a limited role for the plan sponsor: to provide information to the actuary concerning the projection of industry activity, and to 'act reasonably and in good faith' in that function."  Defs. Motion at p. 18, fn. 7, citing 29 U.S.C. § 1085(b)(3)(B)(iii).  Defendants also admit that a plan sponsor can be sued under § 305(b) "for violation *its own duty* to 'act reasonably and in good faith' in its limited role of providing the actuary with industry information under § 1085(b)(3)(B)(iii)."  Defs. Motion at p. 17.

The PPA, 29 U.S.C. § 1085(b)(3)(B) provides, "The actuary's projections shall be based on reasonable actuarial estimates, assumptions, and methods that, except as provided in clause (iii), offer the actuary's best estimate of anticipated experience under the plan."  Thereafter, 29 U.S.C. § 1085(b)(3)(B)(iii) provides "[a]ny projection of activity in the industry or industries covered by the plan, including future covered employment and contribution levels, shall be based on information provided by the plan sponsor, which shall act reasonably and in good faith."

Here, at least some of the assumptions which Plaintiffs have alleged to be unreasonable and to have held to an improper result of certification of critical status, including the assumption regarding the "projected hours,"  Amended Complaint ¶ 68, are based upon projections of industry activity that Defendants were required to provide to the actuary under the statute. Further discovery is required to determine whether the unreasonable assumption regarding "projected hours" that was used by the actuary to certify critical status is solely based upon information provided by Defendants to the actuary regarding projected industry activity.

### 2. The Statutory Scheme Provides for Defendants' Liability for Overseeing the Actuary and for Plaintiffs to Challenge the Certification of Critical Status.

Defendants essentially argue that the PPA's "legislative plan" does not provide this claim.  Defs. Motion at p. 17.  Specifically, Defendants argue that to impose liability on a plan or its trustee sponsors for the plan actuary's purported failures would frustrate the PPA's balanced framework, and would ignore the PPA § 305's basic structure and the measures Congress included to allow effective regulatory overnight of actuaries' certifications."  Defs. Motion at p. 16.  The statutory scheme under the PPA and ERISA provide for Plaintiffs' claims.

### a. Defendants Cannot Hide Behind the Actions of Their Actuary and Absolve Themselves of Fiduciary Duties.

Defendants argue that "Congress's decision not to make plan sponsors vicariously liable for the actions of the plan actuaries must be respected."  Defs. Motion at p. 20.  Defendants argue that "Congress knew how to impose responsibility on others for an actuary's obligations when it wished," citing the PPA requirements that plan sponsors provide information to the actuary concerning the projection of industry activity and that a "failure of the actuary to certify the plan's status" by the deadline "shall be treated … as a failure by the plan administrator to file the annual report" subjecting it to civil penalties.  Defs. Motion at 18, fn.7.  Defendants argue "[t]hat Congress created a limited duty in this narrow circumstance belies the conclusion that plan

sponsors have some broad, overarching responsibility in § 305 to ensure the reasonableness or accuracy of *other* assumptions or responsibilities entrusted to the actuary."  Defs. Motion at p. 18, fn.7.

In fact, Congress did not need to make specific provisions under the PPA to impose liability on the Plan's fiduciaries because such liability already existed under ERISA 502(a)(3). Each provision of a statute, including the PPA, is to be read in reference to the whole act, as a "holistic" approach.  *See Owens v. Auto. Machinists Pension Trust*, 551 F.3d 1138, 1144 (9th Cir. Wash. 2009) (finding that "[when] interpreting [ERISA], our task is to construe what Congress has enacted.  We begin, as always, with the language of the statute.  When looking to the plain language of a statute, we do more than view words or subsections in isolation.  We derive meaning from context, and this requires reading the relevant statutory provisions as a whole."); and *see Hamilton*, 433 F.3d at 1098.  Thus, Defendants' liability cannot be determined by solely by looking at the provisions of the PPA, but must also consider the existing scheme for fiduciary duty and liability under ERISA.  The statutory canon of the "rule of continuity" provides that we should assume that Congress does not create discontinuities in legal rights and obligations without some clear statement.  *See Finley v. United States,* 490 U.S. 545, 554 (U.S. 1989)(holding "Under established canons of statutory construction, 'it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed.'") *citing Anderson v. Pacific Coast S.S. Co.,* 225 U.S. 187, 199 (U.S. 1912).  Similarly, the statutory canon of "the dog didn't bark" presumes that a prior legal rule should be retained if legislative deliberations did not mention or discuss changing the rule. *See Chisom v. Roemer*, 501 U.S. 380, 396 & n.23 (U.S. 1991).  For these reasons, the existing scheme of fiduciary liability for overseeing the work of actuaries was not disturbed by the PPA.

Under ERISA, the Plan's fiduciaries already have an automatic fiduciary duty in selecting, monitoring and overseeing the actuary, and reviewing the actuary's work before taking action upon it.  ERISA's fiduciary duties apply to the selection and retention of service providers, such as actuaries.  *See Batchelor v. Oak Hill Medical Group*, 870 F.2d 1446, 1148-1149 (9th Cir. 1989) (finding that the person selecting the service provider is a fiduciary within the meaning of ERISA and subject to ERISA fiduciary standards).[5]  ERISA's regulations specifically provide "A plan fiduciary may rely on information, data, statistics or analyses furnished by persons performing ministerial functions for the plan, provided that he has exercised prudence in the selection and retention of such persons.  The plan fiduciary will be deemed to have acted prudently in such selection and retention if, in the exercise of ordinary care in such situation, he has no reason to doubt the competence, integrity or responsibility of such persons."  29 C.F.R. 2509.75-8, FR-11.  In addition, the U.S. Department of Labor ("DOL") has stated, "In choosing among potential service providers, as well as in monitoring and deciding whether to retain a service provider, the trustees must objectively assess the qualifications of the service provider, the quality of the work product, and the reasonableness of the fees charged in light of the services provided."  DOL Info. Ltr, Wash. Serv. Bureau No. DLO591, 1998 ERISA LEXIS 11 (July 28, 1998).  The DOL has also issued specific guidance directed to plan fiduciaries, including "Tips for Selecting & Monitoring Service Providers for Your Employee Benefit Plan," which it states is a "starting point" for prudent selection and monitoring" of plan service providers. *www.dol.gov/ebsa*.  Moreover, courts have denied motions to dismiss claims

---

[5] Courts generally have held that actuaries are not fiduciaries themselves, unless they become fiduciaries based upon their activities.  *See Yeseta v. Baima*, 837 F.2d 380, 385 & n. 2 (9th Cir. 1988) (finding attorney and accountant not to be fiduciaries where they exercised purely ministerial duties); 29 C.F.R. § 2509.75-5 (1986) (actuary not fiduciary unless exercised control over management of plan or plan's assets) and *Mertens v. Hewitt Assocs.*, 948 F.2d 607 (9th Cir. 1991); but see *IBEW Local 241 Pension Plan v. First Allmerica Fin. Life Ins. Co.*, 354 F.Supp.2d 203, 206-07 (N.D.N.Y. 2005) (denying summary judgment by actuary because factual disputes remained over whether he exercised discretionary authority in calculating benefits).

that fiduciaries failed to monitor their appointed service providers.  *See, e.g., In re Syncor ERISA Litig.*, 351 F.Supp.2d 970, 984-86 (C.D. Cal. 2004); *Howell v. Motorola,* 337 F.Supp.2d 1079, 1099 (N.D. Ill. 2004).

Thus, Defendants had a fiduciary duty with regard to appointing and monitoring the actuary here.

### b.  Defendants Incorrectly Argue that the Plan Sponsor's Duties are Contingent Upon and Mandated by the Actuary's Certification.

Defendants argue that the PPA's statutory scheme does not allow for Plaintiffs' claim because "[e]xcept for providing industry information to the actuary, as required by § 1085(b)(3)(B)(iii), a plan sponsor's obligations under § 305 are entirely contingent on whether the plan actuary certifies the plan in critical (or endangered) status."  Defs. Motion at p. 18. Defendants argue that "Congress was careful to specify that § 1085(e)'s machinery, with all its plan sponsor duties, is set in motion by the *actuary's certification*."  Defs. Motion at p. 19. However, Defendants' attempt to portray the plan sponsor as passive and completely at the mercy of the actuary is disingenuous and inaccurate, because as discussed above in Point II.B.2.a, Defendants had an active, fiduciary duty to monitor the work of the actuary.  Moreover, the fact that the certification of critical status precedes the other steps that are required after critical status is certified does not mean that the actuary's certification may not be subject to any scrutiny.  In fact, the many steps and significant consequences that follow from the certification of critical status further emphasizes the need for confirmation and testing of the certification rather than blind acceptance of it.

Defendants also argue that "a plan is 'in critical status' not as measured in the abstract, but rather 'as determined by the plan actuary,' *id.* § 1085(b)(2).  The triggering event is thus the *fact* of the actuary's certification."  Defs. Motion at p. 19.  (See also MPA 21 "Congress … chose to make the triggering event the *fact* of the actuary's certification.")  This labeling of the

certification of critical status as a *fact* should be rejected as it falsely portrays a plan's critical status as a verifiable, objective fact that is merely certified by the actuary.  In actuality, whether a plan meets one of the statutory definitions of critical status depends upon a series of projections and assumptions, many of which can be adjusted or manipulated to impact that plan's status. Moreover, at this stage of the proceedings, the facts as alleged by Plaintiffs must be taken as true, including the allegation that the Fund was not actually in critical status and was only found to be in such status due to the unreasonable actuarial assumptions that were applied.

### c. Defendants Imply that the Short Timeframes for Plan Action Leave No Time for Questioning the Certification of Critical Status.

Defendants also argue that the PPA's statutory scheme does not allow for challenges to the certification of critical status because "once the actuary has certified critical status, not only must the plan sponsor perform a wide range of tasks, it must do so within a short time window." Defs. Motion at p. 19.  Defendants also argue that "PPA liability of the type Plaintiffs assume would put plan sponsors in an untenable bind: upon receiving the actuary's critical-status certification, plan sponsors must undertake various affirmative tasks on a tight statutory schedule, within as little as 30 days, or they can be sued for failing to take timely action in response to a critical-status certification."  Defs. Motion at p. 20, citing 29 U.S.C. § 1085(e)(1) i.e. removal of vested benefits that would otherwise be unlawful to take away as is the case here, 1132(e)(1), (a)(10).  Thus, Defendants are implying that the short timeframes for issuing notices and other actions that are required after the certification of critical status leave no time for questioning the certification of critical status.  However, the only truly short timeframe is the 30-day period to issue notice of critical status.  29 U.S.C. § 1085(b)(3)(D).  Because no formal actions are required until the rehabilitation plan has to be adopted 240 days after the certification of critical status, 29 U.S.C. § 1085(e)(1), there is ample room for evaluating the critical status

1   certification, especially given that the Funds' trustees already had an ongoing fiduciary duty to

2   monitor the work of the actuary.

3           **d.  Administrative Oversight is Inadequate and Does Not Replace a Legal Cause
            of Action.**

4

5           Defendants also argue that the PPA does not provide for participant challenges to the

6   certification of critical status because "Section 305 provides for active regulatory oversight."

7   However, Defendants do not provide any details or regulations regarding actions that

8   Department of Labor is required to take to investigate certifications of critical status.  Moreover,

9   Defendants fail to address the fact that many provisions of ERISA only require that Plans file

10  copies of documents with the DOL or the Pension Benefit Guarantee Corporation ("PBGC").

11  However, those filing requirements are often for the purpose of assisting participants with

12  obtaining copies of documents that affect their benefits, and do not necessarily involve any

13  review or analysis by the US DOL and/or the PBGC.

14

15          Lastly, Defendants assert that "From review of the legislative history and attendant

16  statutory commentary, we are aware of no authority to support plan liability for improper

17  actuarial funding certifications, let alone the strict liability Count II proposes."  Defs. Motion at

18  p. 21.  Defendants argue that "[i]t is thus unsurprising that in the years since the PPA was

19  enacted not one reported case has asserted this theory of liability against a multiemployer

20  pension plan or the plan sponsors, much less prevailed on it."  Defs. Motion at p. 14.  As an

21  initial matter, the PPA is still relatively new and the fact that there have been no cases with

22  precisely the same legal theory is of no significance.  Of course, the fact that there have been few

23  or no reported decisions does not mean that there have been no filed cases that have resolved in

24  other ways.  Moreover, there <u>have</u> been successful cases challenging funds' actions taken in

25  reliance on the PPA.  *See Schleben v. Carpenters Pension Trust Fund,* 2014 U.S. Dist. LEXIS

26  128544, 33-34 (E.D. Mich. Sept. 15, 2014).

27

28

1       Notwithstanding the above, the Court should be mindful that this is not just a situation

2 where a pension is alleging that it went into critical status.  At the time of the Fund's Critical

3 Status Notice, the Defendants faced cross motions for judgment on the pleadings in the

4 *Alcantara* case.  Complaint at pp. 34-42.  Defendants' arguments if adopted lead to pensions

5 having the ability to declare themselves in critical status and insulate that decision from <u>any</u>

6

7 review.  Surely the PPA cannot be interpreted to undermine ERISA's remedial purpose entirely.

8      **3.   Defendants Are Not Entitled to a Deferential Standard of Review.**

9       Defendants assert that "any claim of an improper actuarial funding certification must,

10 consistently with the PPA's structure and purpose, be evaluated under the deferential standard of

11 review ERISA reserves for like plan decisions."  Defs. Motion at p. 17.  This is incorrect because

12 the Fund is not interpreting its own plan language in making this decision as would be the case if

13 it were denying a claim for benefits.  Rather, this case turns the interpretation of the statutory

14 language of the PPA and as a result, is subject to *de novo* review by this Court.  *Long v. Flying*

15 *Tiger Line, Inc.*, 994 F.2d 692, 694 (9th Cir. Cal. 1993)(finding "the interpretation of ERISA, a

16 federal statute, is a question of law subject to de novo review.); *citing Arnold v. Arrow Transp.*

17 *Co.*, 926 F.2d 782, 785 (9th Cir. Or. 1991).

18

19      The Court should also reject Defendants' assertions that the difficulties of reversing

20 Defendants' decisions means their decisions should not be subject to challenge at all.

21 Specifically, Defendants assert that "the omelet is not so easily unscrambled," Defs. Motion at p.

22 20, and that the "rehabilitation plan process [is] not so easily unwound," Defs. Motion at p. 21.

23 However, the difficulties and complications that may likely be involved in remedying their

24 actions do not mean that their actions should be left unquestioned.

25

26

27

28

---

1

2

**III. COUNT III ADEQUATELY ALLEGES A BREACH OF FIDUCIARY DUTY BY DEFENDANTS RELATED TO THE CERTIFICATION OF CRITICAL STATUS.**

3

4

5

6

7

8

9

10

11

12

Count III alleges that "[b]y certifying that the Fund was in critical status when in actuality it was not, the Trustees breached their fiduciary duties to act solely in the interest of Fund participants and beneficiaries, as required by ERISA § 404(a); 29 U.S.C. § 1104(a), and ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)."  Amended Compl. at ¶ 77.  This claim is based in part on the fact that the certification of critical status was made while the parties were awaiting a court decision that ruled upon Defendants' prior attempt to take away Plaintiffs' benefits through a plan amendment.  This claim is also based upon the fact that the plan was suddenly certified as being in critical status (less than 65% funded), skipping right over endangered status, when it had never been found to be less than 80% funded before.

13

14

15

16

17

18

19

20

21

22

Defendants argue that Count III must be dismissed because Plaintiffs' allegation that the Fund was not "in actuality" in critical status is "merely conclusory."  Defs. Motion at p. 21.  For the reasons stated in section I.A. above, Plaintiffs' allegations that that Fund was not actually in critical status are not conclusory.  Moreover, Plaintiffs are not required to plead a breach of fiduciary duty with specificity.  *See Concha v. London*, 62 F.3d 1493, 1502 (9th Cir. Cal. 1995)("we have never applied Rule 9(b) in cases in which the plaintiffs allege a breach of fiduciary duty but do not allege fraud.  In fact, the … Defendants cite no case from any jurisdiction requiring plaintiffs to comply with Rule 9(b) when they allege breaches of fiduciary duty – under ERISA or any other law - but do not plead the commission of fraud.").

23

24

25

26

27

For the same reasons Defendants sought judgment with regard to Count II, Defendants request judgment on Count III.  As discussed in detail above in section II.B, Defendants acted pursuant to an independent, statutory duty to provide industry activity projection information to the actuary, and pursuant to their own fiduciary duty in failing to properly oversee the work of

28

the actuary.  Thus, Defendants can properly be held liable for breaches of their fiduciary duty with regard to the certification of critical status.

## IV. COUNT IV ADEQUATELY ALLEGES THAT DEFENDANTS BREACHED THEIR DUTY TO ACT IN THE INTERESTS OF ALL PARTICIPANTS IN ENACTING THE REHABILITATION PLAN.

Count IV of the Amended Complaint alleges that "the Rehabilitation Plan and its resurrection of the July 2010 Amendment favored those participants still working in covered employment over those no longer working in covered employment" and that "[b]y favoring one group of participants over another, the Trustees breached their fiduciary duties to act solely in the interest of Fund participants and beneficiaries, as required by ERISA § 404(a); 29 U.S.C. § 1104(a), and ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)."  Amended Complaint ¶¶ 84-85. Defendants argue first that they did not act as fiduciaries in amending the Plan through their rehabilitation plan, and they argue second that they did not breach their fiduciary duty by improperly favoring active participants over inactive participants because the PPA contemplates such actions.

### A.  The Trustees Acted as Fiduciaries in Amending the Plan Because the Plan Language Designated Amendment as a Fiduciary Act.

Defendants attempt to argue that they did not act as fiduciaries in adopting the Rehabilitation Plan and amending the Plan with regard to the Golden 80/90 benefits.  Defs. Motion at p. 23.  Defendants acknowledge that, while case law generally holds that amending a plan is not a fiduciary function, Plaintiffs' Count IV invokes Section 8.19 of the Plan Rules, which states that "[i]n making any decision to amend the Plan, the Trustees shall act as fiduciaries within the meaning of section 3(21) of ERISA."  Defs. Motion at p. 23.  Defendants argue that "[w]hile Plan Rule 8.19 may require the trustees to act with fiduciary care in amending the Fund's plan as a matter of *plan* compliance, it does not convert the plan sponsor function to a fiduciary function as an ERISA *statutory* matter."  Defs. Motion at p. 23.

However, the Department of Labor has stated that "where relevant documents (e.g., collective bargaining agreements, trust documents, and plan documents) contemplate that the board of trustees of a multiemployer plan will act as fiduciaries in carrying out activities which would otherwise be settlor in nature, such activities would be governed by the fiduciary provisions of ERISA.  In our view, such designation by the plan would result in the board of trustees exercising discretion as fiduciaries in the management or administration of a plan or its assets when undertaking the activities."  Field Assistance Bull., 2002-2 (Nov. 14, 2002).  Thus, even if Defendants' amendment of the Plan through the rehabilitation plan did not otherwise constitute a fiduciary function, the Plan language specifically designating a decision to amend as a fiduciary act "would result in the board of trustees exercising discretion as fiduciaries" in taking such action.  See Field Assistance Bull., 2002-2.

Defendants also falsely assert that "the Amended Complaint expressly disclaims that the Trustees violated Section 8.19, or any other plan term, stating that 'the claims alleged and the relief sough herein arise from *statutory* violations *as opposed to violations of terms of the Fund*, such that the plaintiffs and ... class are not required to exhaust any administrative remedies...." Defs. Motion at p. 23.  Defendants argue "Plaintiffs cannot have it both ways: either they (1) assert a fiduciary breach based on statutory violation of the PPA, in which case they may not be required to exhaust the Fund's administrative remedies, but the claim fails because the allegedly improper amendment is not subject to ERISA fiduciary standards; or (2) Plaintiffs assert a claim based on breach of Defendants' duties under the *plan*, which fails because Plaintiffs have failed to invoke – much less exhaust – the Fund's administrative remedies regarding this claim."  Defs. Motion at p. 23.  However, Plaintiffs are not required to exhaust their administrative remedies in order to pursue their claims, all of which fall under ERISA 502(a)(3).  *See Graphic Communications Union, Dist. Council No. 2 v. GCIU-Employer Retirement Ben. Plan*, 917 F.2d

1184, 1187 (9th Cir. Cal. 1990)(holding that exhaustion of internal dispute procedures is not

required where the issue is whether a violation of the terms or provisions of the statute has

occurred.) *citing Fujikawa v. Gushiken*, 823 F.2d 1341, 1345 (9th Cir. 1987).  Plaintiffs may

pursue their statutory claims for violation of the PPA and ERISA, and their fiduciary breach

claims, regardless of whether they exhausted their administrative remedies.[6]  Thus, Defendants

are manufacturing a false choice that Plaintiffs are not required to make.

**B.   The Trustees Breached Their Fiduciary Duty by Favoring Active Participants.**

    **1.   ERISA Forbids the Trustees to Act in the Interests of Some Participants and Not Others.**

Courts have held that ERISA forbids fiduciaries to favor active participants over those no

longer working.  *See, e.g., Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir. N.Y. 1984).  Courts

have also held, more generally, that trustees may not favor one group of participants or

beneficiaries over another group.  *See, e.g., John Blair Communications, Inc. Profit Sharing Plan

et al. V. Telemundo Group, Inc. Profit Sharing Plan*, 26 F.3d 360 (2nd Cir. 1994).  By removing

the Golden 80/90 benefit which essentially takes away the early retirement reduction factor, it is

only those participants who are not working who will be subject to the loss of this benefit.  Those

who continue to work in covered employment will still be able to benefit from the Golden 80/90

through their continued work in the industry.  Protecting those individuals while at the same time

hurting those not working thus, is a violation of the trustees' fiduciary duty.

    **2.   The PPA Does Not Change ERISA's Requirement that The Trustees Act in the Interests of All Participants.**

Defendants first argue that "PPA § 305 expressly authorizes the very distinction Plaintiffs

claim is unlawful:  with respect to participants for 'whom contributions are not currently required

to be made' (*i.e.,* those no longer in covered employment), it provides that the plan sponsor

---

[6] Importantly, Defendants carefully avoid acknowledging Mr. Reyes <u>did</u> exhaust his remedies, and the result of that effort defines futility.

designing a rehabilitation plan is to have 'flexibility' to 'reduce their adjustable benefits to the extent permitted under this title and considered appropriate by the plan sponsor based on the plan's then current overall funding status." Defs. Motion at p. 24. Defendants also conclusorily argue that "even if Plaintiffs' general understanding of ERISA § 404(a) were correct (though it is not...), the clear and specific authorization in § 305(e)(8) to treat inactive and active participants differently would control." *Id*.

The provision relied upon by Defendants provides, "Plan sponsor flexibility. The plan sponsor shall include in the schedules provided to the bargaining parties an allowance for funding the benefits of participants with respect to whom contributions are not currently required to be made, and shall reduce their benefits to the extent permitted under this subchapter and considered appropriate by the plan sponsor based on the plan's then current overall funding status." 29 U.S.C. 1085(e)(8)(A)(iii).

As is the case with regard to unlawfully favoring those individuals who are still in covered employment, protecting only those for whom contributions are currently required to be made at the expense of those no longer working, remains a breach of the trustees fiduciary duties, especially since there can be other adjustable benefits that can be taken away that would impact both those working and those not working equally.

## **CONCLUSION**

For the foregoing reasons, the Class respectfully requests the Court deny Defendants' Motion for Judgment on the Pleadings.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  November 3, 2015

ABBEY SPANIER LLP
FRUMKIN & HUNTER LLP
LAW OFFICE OF GEOFFREY V. WHITE
SINCLAIRWILLIAMS LLC

By:     /s/  Thomas O. Sinclair

WILLIAM D. FRUMKIN (*admitted pro hac vice*)
ELIZABETH E. HUNTER (*admitted pro hac vice*)
NANCY KABOOLIAN (*pro hac vice to be filed*)
THOMAS O. SINCLAIR (*admitted pro hac vice*)
JUDITH L. SPANIER (*admitted pro hac vice*)
GEOFFREY V. WHITE
M. CLAYBORN WILLIAMS (*admitted pro hac vice*)
Attorneys for Plaintiffs